1  FENNEMORE CRAIG, P.C.
   Douglas C. Northup (No. 013987)
2  Timothy Berg (No. 004170)
   Sean T. Hood (No. 022789)
3  3003 North Central Avenue, Suite 2600
   Phoenix, AZ 85012-2913
4  Telephone: (602) 916-5000
   Email: dnorthup@fclaw.com
5  Email: tberg@fclaw.com
   Email: shood@fclaw.com

6
   Attorneys for Defendants
7  Governor Janice K. Brewer, John S. Halikowski,
   and Stacey K. Stanton
8
   Joseph Sciarrotta, Jr. (No. 017481)
9  Office of Governor Janice K. Brewer
   1700 West Washington St., 9th Floor
10 Phoenix, AZ 85012-2913
   Telephone: (602) 542-1586
11 Email: jsciarrotta@az.gov

12 Co-Counsel for Defendant
   Governor Janice K. Brewer
13

14            UNITED STATES DISTRICT COURT

15               DISTRICT OF ARIZONA

16 Arizona Dream Act Coalition; Jesus          No. CV-12-02546-PHX-DGC
   Castro-Martinez; Christian Jacobo;
17 Alejandra Lopez; Ariel Martinez; and
   Natalia Perez-Gallegos,                     **DEFENDANTS' MOTION TO
18                                             DISMISS COUNTS ONE AND TWO
                   Plaintiffs,                  OF PLAINTIFFS' COMPLAINT
19                                             PURSUANT TO RULE 12(B)(6) AND,
   v.                                          IN THE ALTERNATIVE, MOTION
20                                             FOR SUMMARY JUDGMENT ON
   Janice K. Brewer, Governor of the State of   PLAINTIFFS' EQUAL PROTECTION
21 Arizona, in her official capacity; John S.   CLAIM (COUNT TWO)**
   Halikowski, Director of the Arizona
22 Department of Transportation, in his           **(Oral Argument Requested)**
   official capacity; and Stacey K. Stanton,
23 Assistant Director of the Motor Vehicle
   Division of the Arizona Department of
24 Transportation, in her official capacity,

25                  Defendants.

26 I.    **INTRODUCTION**

27         Plaintiffs seek to invalidate an executive order issued by Arizona Governor Janice

28 Brewer and a policy adopted by ADOT Director John Halikowski on the grounds that: (1)

FENNEMORE CRAIG, P.C.
PHOENIX

the order and policy are preempted by the federal regime that regulates immigration; and (2) the order and policy deny Plaintiffs equal protection of the laws.  It is important to focus on the implications of Plaintiffs' legal challenges here.  Plaintiffs in effect argue that, by virtue of Secretary Janet Napolitano's decision to grant deferred action status to a massive group of persons who are concededly in this country illegally, the State of Arizona is deprived of its long-standing authority to regulate the issuance of driver's licenses under state law.  Taken to its logical conclusion, Plaintiffs' claims would result in wholesale preemption of state driver's licensing laws and would require each and every state to issue licenses to all DACA recipients, without regard to the statutory requirements or public policy of that state or the burdens imposed on the state.

Further, Plaintiffs' preemption and equal protection claims would create serious and unforeseeable consequences for state programs dealing with all other sorts of benefits such as welfare and healthcare.  This is particularly ironic because, as explained below, the federal government itself has singled out this class of illegal immigrants for exactly the sort of differential treatment Plaintiffs challenge here.

Under well-settled precedent, no federal law or regulation preempts Arizona's authority to determine to whom it will issue driver's licenses.  Similarly, Plaintiffs fail to state a claim for Defendants' purported violation of the Equal Protection Clause.  Even if they did, well-established equal protection jurisprudence only requires a rational basis for the policy decision not to issue driver's licenses to DACA recipients.  Applying this standard, the order and the policy clearly pass constitutional muster and the Court should enter judgment for Defendants.

## II.   **BACKGROUND**

In June 2012, the Department of Homeland Security ("DHS") made an administrative policy choice to defer removal of certain illegal aliens who were brought to the United States before the age of sixteen (hereinafter, the "DACA Program").  DHS has expressly acknowledged that the DACA Program does not grant any substantive rights and that only Congress can create substantive immigration reform. In fact, Congress has

repeatedly failed to pass federal immigration legislation to grant legal status to these very individuals.

Some 80,000 potential DACA recipients live in Arizona.    After DHS's announcement of the DACA Program, Arizona Governor Janice Brewer ("Governor Brewer") issued Executive Order 2012-06 (the "Executive Order").    The Executive Order directed state agencies to conduct a full statutory, rulemaking, and policy analysis to prevent DACA recipients—who remain without legally authorized immigration status— from obtaining eligibility for any state or public benefit, including an Arizona driver's license, to which they were not entitled.    Compl., ¶ 3.

The Arizona Department of Transportation ("ADOT") and its director,  Defendant Halikowski ("Director Halikowski"), who possesses a statutory grant of discretionary authority to administer and enforce Arizona's driver's license statute, reviewed and revised existing policy and procedures.    ADOT determined that it would not accept employment authorization documents ("EADs") obtained by DACA recipients as proof satisfactory to ADOT that their presence was authorized under federal law.

Plaintiffs sued Defendants for declaratory and injunctive relief, arguing that the Executive Order and ADOT's policy violate the Supremacy Clause of the United Stated Constitution and the Equal Protection Clause of the Fourteenth Amendment.    Defendants move to dismiss both of Plaintiffs' claims under Federal Rules of Civil Procedure, Rule 12(b)(6).    Alternatively, Defendants move for summary judgment on Plaintiffs' Equal Protection Clause claim.    Defendants support that motion with the concurrently filed Separate Statement of Facts.

A.    **Congressional Authority to Regulate and Classify Aliens Is Embodied in the Immigration and Nationality Act.**

Congress has broad powers, both enumerated and implied, to regulate immigration. *See generally Chae Chan Ping v. United States (The Chinese Exclusion Case)*, 130 U.S. 581 (1889).    The Immigration and Nationality Act (INA) is a comprehensive federal statutory scheme for regulation of immigration and naturalization. *De Canas v. Bica*, 424

FENNEMORE CRAIG, P.C.

PHOENIX

- 3 -

U.S. 351, 353 (1976).  Embodied in the INA is the objective of deterring unauthorized immigration.  *Sure-Tan, Inc. v. NLRB*, 467 U.S. 883, 903 (1984).  The INA creates different classifications of aliens depending on their admissibility and the lawfulness of their presence.  *See* 8 U.S.C. § 1227.  Admissibility is defined as the "lawful entry of the alien into the United States after inspection and authorization by an immigration officer.  8 U.S.C. § 1101(a)(13)(A).  Aliens who are not lawfully admitted to the United States are subject to deportation and other penalties.  *See* 8 U.S.C. §§ 1227, 1324d.

### B.   Deferred Action has no Statutory Basis But Is an Act of Administrative Choice to Temporarily Defer Removal of an Unlawful Alien.

The Secretary of Homeland Security, Janet Napolitano, is charged with the administration and enforcement of the INA and all other laws relating to the immigration and naturalization of aliens.  8 U.S.C. § 1103(a).  U.S. Citizenship and Immigration Services ("USCIS") is the DHS agency that oversees lawful immigration to the United States.[1]   U.S. Immigration and Customs Enforcement ("ICE") is the principal investigative arm of DHS.[2]

DHS and these agencies exercise a form of prosecutorial discretion in determining whether or not to enforce the INA to seek removal of an individual who is not lawfully admitted to the United States.  As defined by the former Immigration and Naturalization Service (INS) in 2000, prosecutorial discretion is "the authority that every law enforcement agency has to decide whether to exercise its enforcement powers against someone."[3]  This discretion cannot regularize someone's immigration status or grant a

---

[1]  http://www.uscis.gov/aboutus, attached as Appendix A1. For the Court's convenience, Defendants have attached an Appendix containing material that Defendants cite from governmental documents.  The Court may take judicial notice of such information without converting a motion to dismiss into a motion for summary judgment and Defendants request the Court do so pursuant to Fed. R. Evid. 201.  *See Daniels-Hall v. Nat'l Educ. Ass'n*, 629 F.3d 992, 998-99 (9th Cir. 2010); *Lee v. City of Los Angeles*, 250 F.3d 668, 689 (9th Cir. 2001).

[2]  *See* http://www.ice.gov/about/overview, attached as Appendix A2.

[3]  See U.S. Department of Justice, Immigration Naturalization Service Fact Sheet, "*Prosecutorial         Discretion         Guidelines*,"         (Nov.         28,         2000), http://iwp.legalmomentum.org/reference/additional-materials/immigration/enforcement-detention-and-criminal-justice/government-documents/c_6-

benefit that an alien is not legally entitled to receive.[4]  Prosecutorial discretion does not create any substantive or procedural rights.[5]  Prosecutorial discretion "does not apply to affirmative acts of approval, or grants of benefits, under a statute or other applicable law that provides requirements for determining when the approval should be given."[6]

One form of prosecutorial discretion available to DHS is "deferred action," which has been defined as an "informal administrative stay of deportation."  *Lennon v. INS*, 527 F.2d 187, 191 & n.7 (2d Cir. 1975) (discussing "nonpriority status," the prior name for deferred action); *see also Soon Bok Yoon v. INS*, 538 F.2d 1211, 1213 (5th Cir. 1976) (construing nonpriority status as a program of administrative convenience).[7]  Employment authorization regulations classify deferred action as "an act of administrative convenience to the government which gives some cases lower priority."  8 C.F.R. § 274a.12(c)(14). There is no express statutory authorization for deferred action.  *Reno v. American-Arab Anti-Discrimination Comm.*, 525 U.S. 471, 484 (1999).

Deferred action is meant to be exercised on an individualized case-by-case basis. *See id* at 484, n.8.  Deferred action is distinguished from statutory exceptions to removal because it is an exception based on policy and not law.[8]  Deferred action confers no protection or benefit on an alien and no alien has the right to deferred action.[9]  Deferred

---

27DOJ2000ProsDiscretionGuideOVW3-31-09.pdf, attached as Appendix A3.

[4] *Id.*

[5] *See* John Morton, Director of U.S. Immigration and Customs Enforcement, "*Exercising Prosecutorial Discretion Consistent with the Civil Enforcement Priorities of the Agency for the Apprehension, Detention, and Removal of Aliens*," (June 17, 2011), http://www.ice.gov/doclib/secure-communities/pdf/prosecutorial-discretion-memo.pdf, attached as Appendix A4, at p. 6.

[6] *See* Memorandum from Doris Meissner, Commissioner of Immigration and Naturalization Service, on Exercising Prosecutorial Discretion (Nov. 17, 2000), http://www.legalactioncenter.org/sites/default/files/docs/lac/Meissner-2000-memo.pdf., attached as Appendix A5.

[7] Plaintiffs' Complaint defines deferred action as "a longstanding form of prosecutorial discretion . . . to refrain from seeking an individual noncitizen's removal . . . based on a review of the individual's case." Compl., ¶ 28.

[8] USCIS Adjudicator's Field Manual ("AFM"), http://www.uscis.gov/ilink/docView/AFM/HTML/AFM/0-0-0-1/0-0-0-38.html#0-0-0-212, pertinent portions of which are attached as Appendix A6, at Chapter 40.9.2 (b)(3).

[9] U.S. Immigration & Customs Enforcement, Office of Detention and Removal

FENNEMORE CRAIG, P.C.

PHOENIX

action does not preclude DHS from commencing removal proceedings at any time against an alien.[10]

**C.     DHS Secretary Napolitano Reaffirms Before Congress the Limited Scope of Deferred Action.**

During a March 9, 2011 congressional hearing, Senator Charles Grassley questioned Secretary Napolitano about a memorandum a staff member at USCIS drafted that contained a discussion about prosecutorial discretion and deferred action in particular.[11]   During that hearing, Secretary Napolitano confirmed deferred action is a limited discretionary action exercised on a case-by-case basis that cannot be used to defer removal of an entire class of aliens:

> **Senator Grassley**:   . . . I have a draft copy of the memo written February 26, 2010, that was intended for you Madam Secretary.  Did you at any time since you became Secretary review memos or proposals that describe administrative options such as deferred action or parole to get around Congress' inaction on the immigration reform bill?  And some of these memos—or this memo referred to efforts that we are not getting anything done on immigration in the Congress, so maybe we ought to take some action through the executive branch.
>
> **Secretary Napolitano**: Well, I can understand the Senator's concern there. *All I can say is, Senator, we have been very clear.  We are not going to give deferred action to large groups as opposed to on a case-by-case basis*, which is what I believe the statute permits . . . .
>
> - - -
>
> **Senator Grassley**: Well, I think that you do correctly state that the law does allow on a case-by-case basis, but the impression you get from these memos that we receive is that Congress was not acting, we need to do something to make a massive amount of people that came here illegally to make them legal.  *And that gets way beyond a case-by-case basis if you are talking about, you know, I do not know how many people, but it sounds to me like*

---

Operations, Detention and Removal Operations Policy and Procedure Manual (March 2006) ("DRO Policy Manual"), AILA InfoNet Doc. 09100571 (Posted 10/05/09), available at http://search.aila.org by entering the document number, the pertinent portions of which are attached as Appendix A7, at § 20.9(a).

[10] *Id.* at § 20.9(a).

[11] Department of Homeland Security Oversight: Hearing before the S. Comm. on the Judiciary, S. HRG. 112-99, 112th Cong. (March 9, 2011) (testimony of Janet Napolitano, Secretary, U.S. Department of Homeland Security), pp. 32-33, http://www.gpo.gov/fdsys/pkg/CHRG-112shrg68104/content-detail.html, pertinent portions of which are attached as Appendix A8.

*thousands of people*.  Let me ask this last point.  Would you commit to providing me by the end of this week with statistics that we have asked for about the number of deferred actions and paroles granted since you became secretary?

**Secretary Napolitano**:  Well, I think if I might, let me—I have some.  As you say, we can do deferred action on a case-by-case basis.  The law permits that, and it is usually for compelling humanitarian concerns, and those are done.  Now, in fiscal year 2010, we removed over 395,000 aliens.  We exercised deferred action in fewer than 900 cases, which was actually fewer deferred actions than were granted in the years prior to that.[12]

On August 18, 2011, Secretary Napolitano wrote a letter to Senator Harry Reid on President Obama's behalf in response to a letter regarding the Obama Administration's immigration enforcement policies and the DREAM Act.[13]  In that letter, Secretary Napolitano reiterated what she had said in her congressional testimony.  She stated that DHS would implement prosecutorial discretion to focus the administration's resources on high priority cases, but confirmed that prosecutorial discretion would "not provide categorical relief for any group."[14]

> **D.**  **Contrary to her Congressional Testimony, Secretary Napolitano Orders Deferred Action for an Entire Class of Unauthorized Immigrants.**

The DREAM Act is the name commonly given to proposed legislation that would give certain illegal immigrants who were brought here illegally before a certain age the opportunity to earn legal status.  Compl., ¶ 2.  The DREAM Act has repeatedly failed to receive Congress's approval.  Taken up by Congress in 2006, 2007, 2009, and 2010, the legislation has been rejected each time, with the most recent rejection in December 2010.[15]  *See* Removal Clarification Act of 2010, H.R. 5281, 111th Cong. (2010).

Nevertheless, on June 15, 2012, Secretary Napolitano issued a memorandum

---

[12] Appendix A8, pp. 32-33.

[13] August 18, 2011 letter from Secretary Janet Napolitano to the Honorable Harry Reid, http://democrats.senate.gov/uploads/2011/08/11_8949_Reid_Dream_Act_response_08.18. 11.pdf, attached as Appendix A9.

[14] *Id.*, p. 2.

[15] Congress considered another version of the DREAM Act in 2011, but did not take any major action.  *See* Development, Relief, and Education for Alien Minors Act of 2011, S. 952, 112th Cong. (2011).

FENNEMORE CRAIG, P.C.

PHOENIX

("DACA Memo") announcing the DACA Program to the directors of the U.S. Citizenship and Immigration Services ("USCIS"), U.S. Immigration and Customs Enforcement ("ICE"), and the Acting Commissioner of U.S. Customs and Border Protection. Compl., ¶ 4. Unlike individualized prosecutorial discretion, The DACA Memo ordered DHS to exercise prosecutorial discretion to grant "deferred action" to temporarily defer removal of an entire class of illegal immigrants, provided they meet certain criteria. *Id.*, ¶ 5.

The DACA Memo stated that such measures "were necessary to ensure that [DHS's] enforcement resources are not expended on these low priority cases but are instead appropriately focused on people who meet our enforcement priorities."[16]   The DACA Memo concluded:

> For individuals who are granted deferred action by either ICE or USCIS, USCIS shall accept applications to determine whether these individuals qualify for work authorization during this period of deferred action.

> This memorandum confers no substantive right, immigration status or pathway to citizenship.  Only the Congress, acting through its legislative authority, can confer these rights.  It remains for the executive branch, however, to set forth policy for the exercise of discretion within the framework of the existing law.  I have done so here.[17]

### E.   DACA Grants Deferred Action on an Unprecedented Magnitude and Scale.

It is estimated that there are 1.76 million DACA-eligible illegal immigrants in the United States and approximately 80,000 residing in Arizona.  Compl., ¶ 7.  As of November 15, 2012, illegal immigrant youth had filed nearly 300,000 DACA applications with USCIS, including over 11,000 applications from Arizona residents.  *Id.*, ¶ 41.  As of November 15, 2012, most of those applications were still in process but USCIS had granted deferred action to at least 53,273 individuals nationwide pursuant to the DACA program.  *Id.*

---

[16] A copy of the DACA Memo is provided at Appendix A10.  Because this document is central to the allegations in Plaintiffs' Complaint, the Court may consider it for purposes of the motion to dismiss and assume its contents are true.  *Marder v. Lopez*, 450 F.3d 445, 448 (9th Cir. 2006).

[17] *See* Appendix A10, p.5.

USCIS's latest statistics, published since Plaintiffs filed their Complaint, demonstrate that, as of December 13, 2012, USCIS has accepted 355,889 DACA applications at an average of 4,433 requests a day.[18]  Of those requests, 157,151 are under review and 102,965 have been approved.[19]  As of December 13, 2012, the number of DACA applications in Arizona had risen to 12,924.[20]  Therefore, the 1,850 (12,924-11,074) DACA applications filed in Arizona alone between November 15, 2012 and December 13, 2012 constitute nearly twice the total amount of the 900 grants of deferred action that Secretary Napolitano testified before Congress were given by DHS on a nationwide basis during 2010.[21]

### F.   Defendants Determine DACA Recipients Are Not Entitled to an Arizona Driver's License.

Arizona's driver licensing laws provide, in pertinent part, that:

> Notwithstanding any other law, the department shall not issue to or renew a driver license or nonoperating identification license for a person who does not submit *proof satisfactory to the department* that the applicant's presence in the United States is authorized under federal law.

A.R.S. § 28-3153(D) (emphasis added).  The statute requires authorized presence in order to obtain a driver's license because possession of an Arizona driver's license demonstrates legal presence under other Arizona statutes and, therefore, can provide access to federal and state benefits in Arizona.  *See* A.R.S. §§ 1-501, 1-502; SOF, ¶ 23.  Under federal and state law, illegal immigrants are not entitled to such benefits.  8 U.S.C. § 1621; A.R.S. §§ 1-501, 1-502.

---

[18] See "*Deferred Action for Childhood Arrivals Process*" (USCIS DACA December 2012 Statistics),   http://www.uscis.gov/USCIS/Resources/Reports%20and%20Studies/ Immigration%20Forms%20Data/All%20Form%20Types/DACA/DACA%20MonthlyDE C%20Report%20PDF.pdf, attached as Appendix A11.

[19] Appendix A11.  Of the 367,903 DACA applications received, 12,014 were rejected at intake.  *Id.*  It is not known how many of these were rejected for formalistic deficiencies and are subject to re-filing, or whether an application can be substantively rejected at filing before a case comes under review.

[20] Appendix A11

[21] *Compare* Appendix A8 *with* Appendix A11; *See also* Compl., ¶ 41.

1.     **ADOT Analyzes the Impact the Scope of the DACA Program Might Have on Arizona.**

After the June 15, 2012 DACA Memo, but before the Executive Order, Director Halikowski and his advisors began reviewing what impact the DACA Program might have on ADOT's enforcement and administration of Arizona's driver's license laws. SOF, ¶ 11.  At the time, the Director saw news articles that stated DHS had said that it was up to the States to determine whether or not to issue driver's licenses to DACA recipients.  SOF, ¶ 12.  Indeed, the Associated Press cited DHS as stating "that each state could determine whether to issue licenses or extend other benefits to young immigrants who qualify for the deferred status."  SOF, ¶ 13.  DHS Spokesman Peter Boogaard, in a news article that addressed Governor Brewer's Executive Order and the present dispute, specifically stated that DHS "doesn't comment on state specific matters." SOF, ¶ 14.

The purpose of ADOT's review was to determine whether ADOT should implement any internal policy or procedure changes as a result of the DACA Program. SOF, ¶ 25.  Director Halikowksi had several concerns that indicated an updated policy might be necessary.  SOF, ¶ 16.  First, he was concerned that persons subject to the DACA Program did not have authorized presence under federal law.  SOF, ¶ 17.  As 80,000 DACA eligible illegal immigrants live in Arizona, Director Halikowski was concerned that ADOT might face liability for issuing 80,000 driver's licenses to illegal immigrants, or from not cancelling those driver's licenses quickly enough, if their presence was not actually authorized.  SOF, ¶¶ 18-19.  The Director knew that ADOT has had to defend itself before from lawsuits arising from the alleged improper issuance of driver's licenses.  SOF, ¶ 20.

Second, granting driver's licenses to DACA recipients could lead to wide-scale and improper access to certain federal and state public benefits.  SOF, ¶ 21.  Director Halikowski understood that DHS had stated the DACA Program did not confer any substantive benefits to the illegal aliens who obtained deferred action under that program. SOF, ¶ 22.  Yet, possession of an Arizona driver's license can provide access to federal

FENNEMORE CRAIG, P.C.

PHOENIX

and state benefits in Arizona, and illegal immigrants are not entitled to such benefits. SOF, ¶ 23. The Director was therefore concerned that giving Arizona driver's licenses to DACA recipients could allow up to 80,000 individuals to access certain federal and state benefits to which, as illegal immigrants, they were not entitled. SOF, ¶ 24.

Third, the DACA Program could be revoked at any time and ADOT would then have to cancel the licenses it had given to DACA recipients. SOF, ¶ 25. However, ADOT would not be able to force those recipients to surrender those licenses and would not be able to unravel any access to public benefits that these driver's licenses had afforded. SOF, ¶ 26.

Fourth, even if the DACA Program was lawful, the Director understood that deferred action confers no protection or benefit on an illegal immigrant and does not preclude DHS from commencing removal proceedings at any time. SOF, ¶ 27. If DACA is revoked and its recipients become subject to immediate deportation and/or are removed from the United States, the Director was concerned those individuals might not be financially responsible for property damage or personal injury they caused in automobile accidents while driving with a license. SOF, ¶ 28.

## 2. Governor Brewer Reaffirms Arizona's Stated Intent to Limit Access to Public Benefits.

On August 15, 2012, Governor Brewer issued the Executive Order to reaffirm the intent of Arizona law in response to the DACA Program. It stated, *inter alia*:[22]

- 8 U.S.C. § 1622 authorizes states to determine eligibility for any state public benefits for most classes of aliens, including aliens with deferred action.

- A.R.S. § 28-3153 prohibits ADOT from issuing a driver's license unless the applicant submits proof satisfactory to ADOT that the applicant's presence is authorized under federal law.

- The federal executive's DACA policy and the resulting federal paperwork issued could result in unlawfully present aliens inappropriately gaining access to public benefits contrary to the intent of Arizona voters and lawmakers who enacted laws expressly restricting access to taxpayer funded benefits and state identification.

---

[22] Plaintiffs attached a copy of the Executive Order as Exhibit 1 to their Complaint.

FENNEMORE CRAIG, P.C.

PHOENIX

- Allowing more than an estimated 80,000 DACA recipients improper access to state or local public benefits "will have significant and lasting impacts on the Arizona budget, its health case system and additional public benefits that Arizona taxpayers fund."

The Executive Order directed state agencies to review existing policies and make necessary changes to prevent DACA recipients from obtaining eligibility for any taxpayer-funded public benefits and state identification, including a driver's license.[23]

### G.   The Federal Government Distinguishes DACA Recipients to Prevent Unintended Access to Public Benefits.

Shortly after Governor Brewer issued the Executive Order, the federal government also addressed the unintended impact that the DACA Program's widespread grant of deferred action might have on access to public benefits.  Just as ADOT did, the federal government distinguished DACA recipients from other deferred action recipients.

On August 28, 2012, the Health and Human Services Department ("HHS") implemented an emergency regulatory action to explicitly carve out DACA recipients from the definition of who is considered "lawfully present" for purposes of the Patient Protection and Affordable Care Act, Public Law 111-148, and the Health Care and Education Reconciliation Act, Public Law 111-152 (collectively "ACA").[24]  Section 1201 of the ACA prohibits health insurance issuers from denying coverage or inflating rates based on pre-existing conditions.[25]  On July 30, 2010, the Secretary of HHS issued an interim final regulation ("IFR") to establish a temporary high-risk health insurance pool program until ACA § 1201 takes effect in January, 2014.[26]

The IFR defined persons eligible to participate in this program (known as the

---

[23] *See* Compl., Ex. 1.

[24] Department of Health and Human Services, "*Pre-Existing Condition Insurance Plan Program*," 77 Fed. Reg. 52614 (Aug. 30, 2012) (codified at 45 C.F.R. § 152.2(8)) (emphasis added), http://www.gpo.gov/fdsys/pkg/FR-2012-08-30/pdf/2012-21519.pdf. For the Court's convenience, copies of HHS's regulatory change that excluded DACA from the definition of lawful presence and 45 C.F.R. 152.2 are attached as Appendix A12.

[25] *Id.*

[26] Department of Health and Human Services, "*Pre-Existing Condition Insurance Plan Program*," 75 Fed. Reg. 45014 (Jul. 30, 2010) (codified at 45 C.F.R.152).

FENNEMORE CRAIG, P.C.

PHOENIX

"PCIP") as "citizen[s] or national[s] of the United States or lawfully present in the United States."[27]  The IFR defined "lawfully present" as having a similar meaning as that given to "lawfully residing" in Medicaid and the Children's Health Insurance Program ("CHIP").[28] Noncitizens "currently in deferred action status" are included among those aliens who fall within the definition of "lawfully present" for purposes of the PCIP.[29]

Significantly, HHS added the following exception in the IFR to exclude DACA recipients from individuals considered "lawfully present" for purposes of the PCIP:

> (8) Exception: ***An individual with deferred action under the Department of Homeland Security's deferred action for childhood arrivals process***, as described in the Secretary of Homeland Security's June 15, 2012 memorandum, ***shall not be considered to be lawfully present*** with respect to any of the above categories in paragraphs (1) through (7) of this definition.[30]

The rational for HHS's regulatory amendment was that:

> As DHS has explained, the DACA process is designed to ensure that governmental resources for the removal of individuals are focused on high priority cases . . . . Because the reasons that DHS offered for adopting the DACA process do not pertain to eligibility for Medicaid or CHIP, ***HHS has determined that these benefits should not be extended as a result of DHS deferred action under DACA.***[31]

HHS amended its definition of "lawfully present" in the PCIP interim final rule "so that the PCIP program interim final rule [did] not inadvertently expand the scope of the DACA process."[32]  HHS implemented its amendment on an emergency basis, effective immediately and without notice and comment, because public interest required "that [HHS] provide clarity with respect to eligibility for this new and unforeseen group of individuals as soon as possible, before anyone with deferred action under the DACA process applies to enroll in the PCIP program."[33]

---

[27] *See* Appendix A12, at 77 Fed. Reg. 52615.

[28] *Id.*

[29] *See* Appendix A12, at 45 C.F.R. § 152.2(4)(vi).

[30] *See* Appendix A12 at Fed. Reg. 52616; 45 C.F.R. § 152.2(8) (emphasis added).

[31] *Id.* at Fed. Reg. 52615 (emphasis added).

[32] *Id.*

[33] *Id.* at Fed. Reg. 52616.

1    Concurrent with the regulatory amendment to the ACA interim final rule, HHS

2    issued an August 28, 2012 letter to state health officials and Medicaid directors.[34]  This

3    letter also amended the definition of "lawfully present" for purposes of Medicaid and

4    CHIP eligibility to exclude DACA recipients.  That letter referred back to a previous July

5    1, 2010 letter which had included "aliens currently in deferred action status" among those

6    considered "lawfully present."[35]   The August 28, 2012 letter restated the policy reasons

7    set forth in the HHS regulatory amendment and concluded "individuals with deferred

8    action under the DACA process shall not be eligible for Medicaid and CHIP."[36]

9    ## H.   Like HHS and USCIS, ADOT Distinguishes DACA Recipients from Recipients of Regular Deferred Action.

10

11    As discussed, ADOT had already started reviewing what, if any, changes it needed

12   to make in response to the DACA Program prior to the issuance of the Executive Order.

13   SOF, ¶¶ 11, 15.  ADOT continued this review.  SOF, ¶ 29.  In the past, ADOT has

14   accepted federally accepted employment authorization documents (EADs) as evidence of

15   aliens' authorized presence in the United States.  Compl., ¶ 9; SOF, ¶ 30.

16    EADs fall into three categories.  The first two categories are for aliens authorized

17   to accept employment incident to lawful immigration and aliens authorized for

18   employment with a specific employer incident to status.  *See* 8 C.F.R. § 274a.12(a), (b).  A

19   third category exists for aliens who are not entitled to employment as a matter of right.

20   Approval for such employment falls within the discretion of USCIS.  *See* 8 C.F.R. §

21   274a.13(a)(1).  Employment authorization in this "residual category" is for aliens "who

22   may or may not have any legal status" and can be terminated at any time.  *Garcia v.*

23   _____

24   [34] Center for Medicaid & CHIP Services, Re: "*Individuals with Deferred Action for Childhood Arrivals*," (SHO # 12-002) (August 28, 2012), http://www.medicaid.gov/Federal-Policy-Guidance/downloads/SHO-12-002.pdf, attached hereto as Appendix A13.

25

26   [35] *See* Center for Medicaid & CHIP Services, Re: "*Medicaid and CHIP Coverage of Lawfully Residing Children and Pregnant Women*," (SHO # 10-006) (July 1, 2010), http://downloads.cms.gov/cmsgov/archived-downloads/SMDL/downloads/sho10006.pdf, attached hereto as Appendix A14, at pp. 4, 11.

27

28   [36] Appendix A13, p. 1.

FENNEMORE CRAIG, P.C.
PHOENIX

*Holder,* 659 F.3d 1261, 1270 (9th Cir. 2011).  Illegal immigrants under deferred action fall into this category.  *See* 8 C.F.R. § 274a.12(c)(14).

Before implementation of the DACA Program, some of the EADs ADOT accepted may have been issued under 8 C.F.R. 274a.12(c)(14) to people who received grants of regular deferred action (i.e., not pursuant to DACA).  SOF, ¶ 30.  Until very recently, ADOT was not aware that it was issuing driver's licenses based on EADs that had been issued to aliens who had received deferred action but who had no actual authorized immigration status.  SOF, ¶ 31. ADOT expects to discover that it gave a very limited amount of driver's licenses to such regular deferred action recipients in past years. SOF, ¶ 32.

During its review of internal policies that ADOT conducted because of the DACA Program and the Executive Order, ADOT sought advice from the local USCIS office. SOF, ¶ 33.  ADOT learned that USCIS expressly distinguishes DACA from regular deferred action with regard to applications for EADs.  SOF, ¶ 34.

USCIS form I-765, identified as an Application for Employment Authorization, must be filed by aliens seeking EADs.  To determine EAD eligibility, USCIS requires that the alien identify the category in which that alien is eligible for employment and then fill in that category.[37]  In response to its inquiry, ADOT received an email on October 10, 2012 from local USCIS Community Relations Officer, Marianna Paredes, which stated:

> PLEASE NOTE: The eligibility category for work authorizations under Deferred Action for Childhood Arrivals is NOT the same eligibility category as work authorizations under regular deferred action.
>
> Page 5 of the current I-765 instructions indicate that **people requesting work authorization as part of Deferred Action for Childhood Arrivals should fill in "C33" in question 16 of the Form I-765.** (Do NOT use C14 as this is the category for regular deferred action.)

SOF, ¶ 35 (emphasis in original).

In response to the Director's significant concerns set forth above, and upon

---

[37]    Instructions    for    I-765,    Application    for    Employment    Authorization, http://www.uscis.gov/files/form/i-765instr.pdf, attached hereto as Appendix A15, at p.1.

determination that USCIS itself was distinguishing DACA from regular deferred action, ADOT revised Policy 16.1.4 which addressed establishing authorized presence for purposes of Arizona's driver's license statute.  SOF, ¶ 36.  In the policy ("ADOT's Policy"), ADOT created a distinction between EADs obtained by DACA recipients and other EADs.  SOF, ¶ 37.

As noted above, the DACA Program affected ADOT interests in a manner that prior grants of regular deferred action did not.  SOF, ¶ 38.  ADOT's Policy determined that a driver's license applicant who submitted an EAD granted pursuant to category (c)(33) did not submit proof satisfactory to ADOT, under A.R.S. § 28-3153(D), that the applicant's presence was authorized under federal law.  SOF, ¶ 39.  Recently, and in specific regard to this lawsuit, DHS spokesman Peter Boogaard provided support for ADOT's policy determination when he stated in a news article that "[DHS's] decision not to try to deport some people does not actually authorize them to be in the United States."  SOF, ¶ 40.

## III.   <u>LEGAL STANDARD</u>

To survive a Rule 12(b)(6) motion to dismiss, the plaintiff must allege "enough facts to state a claim for relief that is plausible on its face." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007).  This "facial plausibility" standard requires the plaintiff to allege facts that add up to "more than a sheer possibility that a defendant has acted unlawfully." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009).

Although courts do not require "heightened fact pleading of specifics," a plaintiff must allege facts sufficient to "raise a right to relief above the speculative level." *Twombly*, 550 U.S. at 555.  Plaintiffs' obligation to provide the "grounds of [their] entitlement to relief requires more than labels and conclusions, [or] a formulaic recitation of the elements of the cause of action . . . ." *Id.* (internal alterations and quotation marks omitted).

The factual allegations, assumed to be true, must do more than create speculation or suspicion of a legally cognizable cause of action; they must show entitlement to relief.

1   *Id.*  To state a valid claim, a complaint must contain either direct or inferential allegations

2   respecting all material elements to sustain recovery under some viable legal theory.  *Id.* at

3   562.  Moreover, the Court need not "accept legal conclusions cast in the form of factual

4   allegations if those conclusions cannot reasonably be drawn from the facts alleged."

5   *Clegg v. Cult Awareness Network*, 18 F.3d 752, 754-55 (9th Cir. 1994).

6          Summary judgment is appropriate if "there is no genuine dispute as to any material

7   fact and the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(a).

8   Once the moving party has satisfied its burden, it is entitled to summary judgment if the

9   non-moving party fails to present, by affidavits, depositions, answers to interrogatories, or

10  admissions on file, "specific facts showing that there is a genuine issue for trial."  *Celotex*

11  *Corp. v. Catrett*, 477 U.S. 317, 324 (1986).  "The mere existence of a scintilla of evidence

12  in support of the nonmoving party's position is not sufficient."  *Triton Energy Corp. v.*

13  *Square D Co.*, 68 F.3d 1216, 1221 (9th Cir. 1995).  Factual disputes whose resolution

14  would not affect the outcome of the suit are irrelevant to the consideration of a motion for

15  summary judgment.  *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).

16  **IV.**    **PLAINTIFFS' COMPLAINT DOES NOT SUFFICIENTLY STATE A**

17  **CLAIM FOR VIOLATION OF THE SUPREMACY CLAUSE.**

18         The Supremacy Clause gives Congress the power to preempt state law, either

19  expressly or impliedly.  U.S. Const., Art. VI, cl. 2; *Arizona v. United States*, 132 S. Ct.

20  2492, 2500-01 (2012).  Congress may expressly preempt state law by including an explicit

21  preemption provision in a statute.  *Id.*  Alternatively, preemption of a state law may be

22  implied through field preemption or conflict preemption.  *Id.* at 2501.  Field preemption

23  occurs when Congress intends to occupy an entire regulatory field leaving no room for

24  state lawmaking in that area.  *Id.*  Conflict preemption occurs when Congress has not

25  evidenced an intention to occupy an entire area, but a state law still conflicts with a

26  federal law.  *Id.*

27         To balance preemption with the principles of federalism, there are two important

28  cornerstones of preemption jurisprudence.  First, "the purpose of Congress is the ultimate

touchstone in every pre-emption case." *Wyeth v. Levine*, 555 U.S. 555, 565 (2009). Second, "in all pre-emption cases . . . [the court] start[s] with the assumption that the historic police powers of the States were not to be superseded by the Federal Act unless that was the clear and manifest purpose of Congress." *Id.*; *see also Chicanos Por La Causa, Inc. v, Napolitano*, 544 F.3d 976, 983 (9th Cir. 2008).

Plaintiffs' Complaint fails to plead that the Executive Order and ADOT's Policy are expressly or impliedly preempted by federal law. They fail to allege that an express preemption provision enacted by Congress applies and they cannot sufficiently allege that the Executive Order or ADOT's Policy—both of which are solely directed at the regulation of state-issued driver's licenses—regulate the field of "immigration" or otherwise conflict with federal law.

## A.  The DACA Program Is Not Federal Law for Preemption Purposes.

Plaintiffs argue that the Executive Order and ADOT's Policy are preempted by the objectives and purposes of the DACA Program itself, as opposed to federal statute enacted by Congress. *See* Compl., ¶ 71. Plaintiffs' novel position relies on the incorrect assumption that the DACA Program is a form of federal agency action sufficient to preempt state law, which it is not.

The DACA Program is not a federal statute enacted by Congress. Although state laws may also be preempted by federal agency regulations, a federal executive agency's action may only preempt state law if (1) the agency intended the action to have some preemptive effect; and (2) the agency's preemptive action was within the scope of the authority Congress delegated to the agency. *See Barrientos v. 1801-1825 Morton LLC*, 583 F.3d 1197, 1208 (9th Cir. 2009). Importantly, a court reviewing the preemptive effect of a federal agency's actions "does not focus on Congress' intent to supersede state law because a pre-emptive regulation's force does not depend on express congressional authorization to displace state law." *Id.* (internal quotation marks and alterations omitted). Moreover, the agency's action should not have a preemptive effect if "it appears from the statute or its legislative history that the accommodation is not one that Congress would

1   have sanctioned." *Id.*

2       As an initial matter, the DACA Program is not a codified federal regulation.

3   Instead, it is an administrative policy choice by DHS to direct its agents to exercise

4   prosecutorial discretion on a massive, unprecedented scale and defer removal of DACA

5   recipients.  Even assuming the DACA Program had the same preemptive scope as a

6   federal regulation (which it does not), it was not intended to preempt state action such as

7   the Executive Order and ADOT's Policy and was not issued clearly within the scope of

8   congressionally delegated authority.

9       **1.    The DACA Program Is Not Federal Law Intended to Preempt**

10          **State Law.**

11      Nothing in the DACA Memo itself suggests that it is intended to preempt state law

12  directed at the issuance of driver's licenses to DACA recipients.  *Cf. AT&T Commc'ns of*

13  *Cal., Inc. v. Pac-West Telecomm, Inc.*, 651 F.3d 980, 991 (9th Cir. 2011) (recognizing that

14  the analysis of whether an agency intended to preempt certain state laws begins with a

15  review of the agency's choice of language in the regulation at issue).  In fact, in the

16  DACA Memo, Secretary Napolitano characterized the DACA Program as an executive

17  policy choice, not law:

18          [The DACA Program] confers no substantive right, immigration status or
            pathway to citizenship.  Only the Congress, acting through its legislative
19          authority, can confer these rights.  It remains for the executive branch,
            however, to set forth policy for the exercise of discretion within the
20          framework of the existing law.  I have done so here.[38]

21  The DACA Program, a "policy" characterized by the federal agency itself as not

22  conferring any "substantive right," does not evidence any intent by DHS to preempt state

23  laws on issuing driver's licenses to DACA recipients.

24      Furthermore, the conclusion that DHS did not intend the DACA Program to have

25  any preemptive effect is reinforced by President Obama's general policy directive to

26  executive agencies that warns against the unbridled use of agency preemption.  On May

27

28  _____
    [38] *See* Appendix A10, p.3.

20, 2009, President Obama issued a memorandum to the heads of executive departments and agencies that stated, in part, "the general policy of my Administration [is] that preemption of State law by executive departments and agencies should be undertaken only with full consideration of the legitimate prerogatives of the States and with a sufficient legal basis for preemption."[39]  President Obama's memorandum demonstrates that federal agency preemption of state law, such as the effect of the DACA Program argued by Plaintiffs, should not be assumed or intended without a clear legal basis.   No such basis is present here, and there can be no finding of preemption.

### 2. **Implementation of the DACA Program Was Not Clearly Within the Scope of Congress's Delegated Authority to DHS.**

Congress statutorily delegated the "administration and enforcement" of the INA to the Secretary of Homeland Security. 8 U.S.C. § 1103(a)(1).  Secretary Napolitano herself acknowledged to Congress that any statutory authority to defer action on a case-by-case basis did not encompass authority to defer removal of a large group of people.  *See* Appendix A8 (Testimony of Secretary Napolitano) ("All I can say is, Senator, we have been very clear.  We are not going to give deferred action to large groups as opposed to on a case-by-case basis, which is what I believe the statute permits.").   If Congress's delegated authority were meant to allow the Secretary of Homeland Security to implement broad-reaching policies that precluded the deportation of large groups of illegal aliens and thereby confer authorized status, the Secretary could unilaterally create immigration law, even when it was contrary to Congress's enunciated positions.

For these reasons, the DACA Program does not preempt state law, and Plaintiffs' claims that the Executive Order and ADOT's Policy are preempted by the terms of the DACA Program fail to state a claim for relief.  Moreover, as discussed below, established Supreme Court precedent demonstrates that the DACA Program cannot be found to

---

[39]  *See* May 20, 2009 Memorandum for the Heads of Executive Departments and Agencies; Subject: Preemption, http://www.whitehouse.gov/the_press_office/Presidential-Memorandum-Regarding-Preemption, attached hereto as Appendix A16.

1   preempt the Executive Order and ADOT's Policy.

2   **B.   Plaintiffs Cannot Allege that the Executive Order and ADOT's Policy**
3   **Are Preempted by Any Express Preemption Provision.**

4   Express preemption occurs only when Congress "withdraw[s] specified powers

5   from the States by enacting a statute containing an express preemption provision."

6   *Arizona*, 132 S. Ct. at 2500-01.  A finding of express preemption requires that a federal

7   law explicitly command that a certain topic forming the basis for a state law be displaced.

8   *Lozano v. City of Hazelton*, 496 F. Supp. 2d 477, 518-19 (M.D. Pa. 2007), *vacated on*

9   *other grounds*, 620 F.3d 170 (3d Cir. 2010).  Plaintiffs do not, and cannot, allege that the

10  DACA Program, or any federal law, includes a provision explicitly preempting regulation

11  of state-issued driver's licenses.

12  **C.   Plaintiffs Fail to Sufficiently Allege that the Executive Order or**
13  **ADOT's Policy Regulate a Preempted Field.**

14  Field preemption occurs when a congressional legislative scheme is "so pervasive

15  as to make reasonable the inference that Congress left no room for the States to

16  supplement it."  *Rice v. Santa Fe Elevator Corp.*, 331 U.S. 218, 230 (1947).  Thus, "the

17  States are precluded from regulating conduct in a field that Congress, acting within its

18  proper authority, has determined must be regulated by its exclusive governance."

19  *Arizona*, 132 S. Ct. at 2501.  Plaintiffs do not allege the existence of any act of Congress

20  that demonstrates Congress's intention to preempt the field of regulation of driver's

21  licenses.  They cannot do so, as the issuance of driver's licenses is a clear traditional state

22  police power.[40]

---

23  [40] Although Congress has indicated its interest in being involved in creating minimum
24  standards for identification to be utilized for federal purposes, through the enactment of
    the REAL ID Act, the language of the REAL ID Act recognizes that it is the states' roles
    to regulate and issue driver's licenses to their residents.  *See* 49 U.S.C. § 30301, *et seq.*
25  Congress's acknowledgement that the issuance of driver's licenses is a power left to the
    states is highly indicative of the lack of preemption in this area.  *See Wyeth*, 555 U.S. at
26  576 ("The case for federal preemption is particularly weak where Congress has indicated
    its awareness of the operation of state law in a field of federal interest, and has
27  nonetheless decided to stand by both concepts and to tolerate whatever tension there [is]
    between them.") (quoting *Bonito Boats, Inc. v. Thunder Craft Boats, Inc.*, 489 U.S. 141,
28  166-67 (1989)).

1   In an attempt to allege field preemption, Plaintiffs contend that the Executive Order

2   and ADOT's Policy violate the Supremacy Clause, not by regulating state-issued driver's

3   licenses, but instead by impermissibly regulating the field of "immigration." Compl., ¶¶

4   13, 69-70.   Plaintiffs' claim for field preemption fails as a matter of law because the

5   Executive Order and ADOT's Policy are not directed at immigration status or regulating

6   immigration—i.e., who should remain or not remain in the United States.

7       **1.**     **The Executive Order and ADOT's Policy Do Not Create**
        **Immigration Classifications.**
8

9   Although the field of "immigration" is within the exclusive governance of

10  Congress, *see Chamber of Commerce of the U.S. v. Whiting*, 131 S. Ct. 1968, 1974

11  (2011), the field of immigration for preemption purposes is limited to situations where the

12  states attempt to regulate the status, admission, or condition of aliens and immigrants

13  remaining in the United States.

14      In *De Canas*, 424 U.S. at 352, legal immigrant farm workers in California sued

15  labor contractors for violation of a California statute prohibiting employers from

16  knowingly employing an illegal alien.   The Court addressed whether the California statute

17  was preempted under the Supremacy Clause and explained the application of Supremacy

18  Clause preemption to the field of "immigration":

19          Power to regulate immigration is unquestionably exclusively a federal
            power. But the Court has never held that every state enactment which in any
20          way deals with aliens is a regulation of immigration and thus per se pre-
            empted by this constitutional power, whether latent or exercised. . . .  *[T]he*
21          *fact that aliens are the subject of a state statute does not render it a*
            *regulation of immigration, which is essentially a determination of who*
22          *should or should not be admitted into the country, and the conditions under*
            *which a legal entrant may remain.*
23

24  *Id.* at 354-55 (internal quotation marks and citations omitted) (emphasis added).   The

25  Court added that "even if such local regulation has some purely speculative and indirect

26  impact on immigration, it does not thereby become a constitutionally proscribed

27  regulation of immigration that Congress itself would be powerless to authorize or

28  approve." *Id.* at 355.

1    The *De Canas* Court recognized that states possess broad authority under their

2    police powers to regulate the employment relationship to protect workers within the State

3    and that the INA did not preempt the statute.  Specifically, the Court explained:

> [W]e will not presume that Congress, in enacting the INA, intended to oust
> state authority to regulate the employment relationship covered by
> [California's statute] in a manner consistent with pertinent federal laws.
> Only a demonstration that complete ouster of state power—including state
> power to promulgate laws not in conflict with federal laws—was "the clear
> and manifest purpose of Congress" would justify that conclusion.

8    *Id.* at 357-58.

9    Federal courts have regularly cited to *De Canas* as a basis for refusing to find

10   preemption.  *See, e.g.*, *Keller v. City of Fremont*, 853 F. Supp. 2d 959, 972 (D. Neb. 2012)

11   (holding that a city ordinance requiring tenants to obtain an occupancy license which

12   required evidence of lawful status is not preempted because Congress has only preempted

13   "what, where, when, and how aliens or immigrants may enter and must leave the

14   country"); *Equal Access Educ. v. Merten*, 305 F. Supp. 2d 585, 601 (E.D. Va. 2004)

15   (granting motion to dismiss Supremacy Clause claim that state law denying post-

16   secondary admission to illegal aliens was preempted).

17   Plaintiffs mischaracterize the Executive Order in an attempt to plead field

18   preemption by arguing that the Order "creat[es] a new, state-based classification of non-

19   citizens that treats DACA recipients as though they were unauthorized and unlawfully

20   present."  Compl., ¶ 69.  However, similar to the California statute in *De Canas*, the

21   Executive Order does not make a determination as to alien status.  Instead, the Order

22   expressly adopts the classifications of the DACA Program.  Based on the federal

23   administrative classification of DACA recipients as illegal aliens who have been granted a

24   temporary reprieve from deportation, the Executive Order and ADOT's Policy simply

25   clarify Arizona's position precluding DACA recipients from using EADs to obtain

26   driver's licenses or state identification.

27   Importantly, when a state law incorporates immigration classifications adopted by

28   the federal government, courts are extremely cautious in finding the existence of field

preemption.  In a very similar case, *John Doe No. 1 v. Georgia Department of Public Safety*, 147 F. Supp. 2d 1369 (N.D. Ga. 2001), the State of Georgia had passed a law that "no person shall be considered a resident for purposes of this chapter unless such person is either a United States citizen or an alien with legal authorization from the U.S. Immigration and Naturalization Service." *Id.* at 1372 (citing O.C.G.A. § 40-5-15(15)).  In that case, the plaintiff presented the exact same argument as do Plaintiffs here—namely that the Georgia statute was preempted as an impermissible regulation of the field of immigration. *Id.* at 1375.  The court cited to *De Canas* and held that "Plaintiff's argument that the Georgia driver's license statute is a substantial burden upon national immigration policy is totally without merit. The Georgia statutes mirror federal objectives by denying Georgia driver's licenses to those who are in this country illegally according to federal law." *Id.* at 1376.

### 2. The Regulation of State-Issued Driver's Licenses Is Not an Attempt to Regulate the Field of Immigration.

Not only do Plaintiffs allege that the Executive Order creates immigration classifications (which it does not) they also claim that the Executive Order and ADOT's Policy are field preempted because the denial of driver's licenses to DACA recipients "impose[s] immigration-related burdens and penalties . . . not contemplated by federal law." Compl., ¶ 70.[41]

Plaintiffs' allegation fails as a matter of law.  Federal courts have already held that state laws prohibiting the issuance of state-issued driver's licenses to illegal aliens are not preempted as an impermissible regulation of the field of immigration. *See John Doe No. 1*, 147 F. Supp. 2d at 1376.  Furthermore, a state law that attempts to regulate an area that is traditionally in the state's police power does not constitute a regulation of

---

[41] If Plaintiffs were correct, and the Executive Order and ADOT's Policy were impermissible regulations of the field of immigration solely because they impose "immigration-related burdens and penalties" then, by extension, any state law that references an immigration classification would be subject to field preemption. As is clear from *De Canas*, that is not the law.

FENNEMORE CRAIG, P.C.

PHOENIX

1    "immigration." *See De Canas*, 424 U.S. at 356. Because the regulation of driver's

2    licensing is well within a state's traditional police power, *see, e.g.*, *United States v.*

3    *Thurman*, 316 F. App'x 599, 602 (9th Cir. 2009); *Coleman v. Watts*, 40 F.3d 255, 262

4    (8th Cir. 1994); *United States v. Snyder*, 852 F.2d 471, 475 (9th Cir. 1988), the Executive

5    Order and ADOT's Policy are not a regulation of "immigration" for preemption purposes

6    under any set of facts alleged by Plaintiffs.

7        Although Plaintiffs attempt to limit their field preemption claim to state laws

8    prohibiting the issuance of driver's licenses to individuals who do not have lawful

9    presence in the United States, the Court should focus on the breadth of the effect of their

10    claim. Essentially, if, as Plaintiffs claim, the Executive Order and ADOT's Policy are

11    field preempted as impermissible regulations of the field of immigration, then *any state*

12    *statute governing the regulation of driver's licenses for DACA recipients*—regardless of

13    the specific language of the statute or whether the statute authorizes or precludes the

14    issuance of driver's licenses—would also be preempted. *Cf. Arizona*, 132 S. Ct. at 2502

15    (finding that, "[w]here Congress occupies an entire field, . . . even complementary state

16    regulation is impermissible [because] [f]ield preemption reflects a congressional decision

17    to foreclose any state regulation in the area, even if it is parallel to federal standards").

18    This cannot be correct because, as discussed *supra*, the regulation of state-issued driver's

19    licenses has long been recognized as a traditional state power.

### D.    Plaintiffs Cannot Allege that the Executive Order and ADOT's Policy Conflict with Federal Law.

22        Even when Congress has not explicitly preempted an area or otherwise intended to

23    occupy a preempted field, state laws can still be preempted if they "conflict" with federal

24    law. Conflict preemption occurs in two instances: (1) where compliance with both federal

25    and state regulations is a physical impossibility"; and (2) "where the challenged state law

26    stands as an obstacle to the accomplishment and execution of the full purposes and

27    objectives *of Congress*." *Arizona*, 132 S. Ct. at 2501 (internal citations and quotation

28    marks omitted) (emphasis added). Plaintiffs are unable to show that the Executive Order

FENNEMORE CRAIG, P.C.

PHOENIX

and ADOT's Policy conflict with any purpose and objective of Congress.

### 1.    Compliance with the Executive Order, ADOT's Policy, and the DACA Program Is Not a Physical Impossibility.

Plaintiffs do not, and cannot, allege that it is *impossible* to comply with the Executive Order and ADOT's Policy while also complying with federal immigration laws and the DACA Program.   There is no provision in the INA or any other federal immigration-related law that requires a state to issue driver's licenses or state identification cards to any particular group of immigrants.   Additionally, nothing in the DACA Program authorizes DACA recipients to obtain driver's licenses.   Furthermore, nothing in the Executive Order or ADOT's Policy makes it physically impossible for DACA recipients to reside in Arizona, temporarily avoid the fear of deportation, or obtain temporary authorization for employment in Arizona.

### 2.    The Executive Order and ADOT's Policy Do Not Conflict with Federal Law.

According to Plaintiffs, conflict preemption applies because "[d]enying driver's licenses to DACA recipients in Arizona severely frustrates their ability to obtain employment and achieve economic self-sufficiency."  Compl., ¶ 52.  However, because Plaintiffs cannot meet the high threshold necessary for a finding of conflict preemption, they have failed to state a claim for relief.

The Supreme Court has concluded that "a high threshold must be met if a state law is to be preempted for conflicting with the purposes of a federal Act."  *Whiting*, 131 S. Ct. at 1985 (quoting *Gade v. Nat'l Solid Waste Mgmt. Ass'n*, 505 U.S. 88, 110 (1992)); *see also Incalza v. Fendi N. Am., Inc.*, 479 F.3d 1005, 1009 (9th Cir. 2007) ("Tension between federal and state law is not enough to establish conflict preemption."); *Ariz. Contractors Ass'n, Inc. v. Napolitano*, Nos. CV07-1355, CV07-1684, 2007 WL 4570303, at *8 (D. Ariz. Dec. 21, 2007) ("A mere difference between state and federal law is not conflict."). In fact, a state law is generally only an impermissible "obstacle" to the "purposes and objectives" of a federal law "[i]f the purpose of the act cannot otherwise be

accomplished[,] if its operation within its chosen field else must be frustrated[,] and its provisions be refused their natural effect . . . ." *Crosby v. Nat'l Foreign Trade Council*, 530 U.S. 363, 373 (2000) (quoting *Savage v. Jones*, 225 U.S. 501, 533 (1912)). Furthermore, an analysis of conflict preemption "does not justify a freewheeling judicial inquiry into whether a state statute is in tension with federal objectives; such an endeavor would undercut the principle that it is Congress rather than the courts that preempts state law." *Whiting*, 131 S. Ct. at 1985.

Plaintiffs' Complaint does not allege an actual conflict.  Plaintiffs themselves acknowledge that the limited purposes of the DACA Program is to allow certain illegal immigrants to (1) "stay in the United States for a renewable period of two years," (2) be "shielded from removal proceedings during that time," and (3) "be granted federal employment authorization and a Social Security Number."  Compl., ¶ 6.  The Executive Order and ADOT's Policy do not prevent the accomplishment of any of these purposes.

As noted before, Plaintiffs contend that the Executive Order and ADOT's Policy are obstacles to achieving employment by DACA recipients because it is "difficult, if not impossible" for Plaintiffs to maintain or obtain productive employment without having a driver's license.  Compl., ¶ 12.  This argument, even if true, does not meet the high threshold for conflict preemption.  The denial of a single form of transportation, i.e. the privilege to drive a car, is not an "obstacle" to any federal law and does prevent the implementation of the DACA policy.  Thus, there is no legal basis for the court to take the extraordinary step and  find that that the DACA policy  preempts state law. *Cf. Miller v. Reed*, 176 F.3d 1202, 1205-06 (9th Cir. 1999) (finding that burdens on a single mode of transportation do not rise to the level of a violation of a constitutional right); *Monarch Travel Servs., Inc. v. Associated Cultural Clubs, Inc.*, 466 F.2d 552, 554 (9th Cir. 1972) ("A rich man can choose to drive a limousine; a poor man may have to walk. The poor man's lack of choice in his mode of travel may be unfortunate, but it is not unconstitutional.").  Because the Executive Order and ADOT's Policy do not conflict with the DACA Program, the Court should dismiss the claim with prejudice.

1
2

## V.     THE EXECUTIVE ORDER AND ADOT'S POLICY DO NOT VIOLATE THE EQUAL PROTECTION CLAUSE.

3     The Equal Protection Clause prohibits states from "denying to any person within its

4 jurisdiction the equal protection of the laws."  U.S. Const. amend. XIV, § 1.  When those

5 who are similarly situated are treated differently, the Equal Protection Clause requires at

6 least a rational reason for the difference, to assure that all persons subject to legislation or

7 regulation are indeed being "treated alike, under like circumstances and conditions."

8 *Engquist v. Or. Dep't of Agric.*, 553 U.S. 591, 602 (2008) (quoting *Hayes v. Missouri*, 120

9 U.S. 68, 71-72 (1887)).

10     Before the Court conducts an Equal Protection analysis, it must first decide

11 whether the individual Plaintiffs, and the class they purport to represent, are similarly

12 situated to other aliens that have obtained Arizona driver's licenses by submitting federal

13 employment authorization documents (EADs).  *See, e.g.*, *United States v. Armstrong*, 517

14 U.S. 456, 470 (1996); *Christian Gospel Church, Inc. v. City and Cnty. of San Francisco*,

15 896 F.2d 1221, 1225 (9th Cir. 1990).  Only if the Court determines that DACA recipients

16 are similarly situated to other aliens who have been issued EADs does the Court

17 determine whether Defendants' separate classification of DACA recipients is rationally

18 related to a legitimate state interest.  *Heller v. Doe*, 509 U.S. 312, 319-20 (1993).

19     The basis of Plaintiffs' Equal Protection Clause claim is that ADOT has previously

20 granted licenses to other individuals granted deferred action or other forms of temporary

21 authorization to remain in the United States but has distinguished DACA recipients from

22 those other applicants.  *See* Compl., ¶ 73.  Defendants agree that ADOT has previously

23 issued such licenses on a very limited basis.  DACA recipients, however, are not similarly

24 situated to other recipients of deferred action or other forms of temporary authorization.

25 Even if they are similarly situated, Defendants have a strong state interest that is rationally

26 related to their decision to distinguish DACA recipients.

27 / / /

28 / / /

A.   **The Federal Government Has Determined that DACA Recipients Are Not Similarly Situated to Recipients of Regular Deferred Action.**

Perhaps the most compelling reason why Defendants' actions do not violate the Equal Protection Clause is that two agencies of the federal government have also distinguished DACA from regular grants of deferred action.

1.   **HHS Determined that DACA Recipients Were Not Lawfully Present for Purposes of Benefits Eligibility under the Affordable Care Act.**

As discussed above, the federal Department of Health and Human Services (HHS) made an emergency regulatory change to an interim final rule that addressed eligibility for certain benefits related to the Affordable Care Act.  The definition of "lawful presence" for purposes of those eligible for those benefits included noncitizens "currently in deferred action status."[42]  Around the same time as Governor Brewer issued the Executive Order, HHS issued a federal regulation on an emergency basis to distinguish DACA from other grants of deferred action and to exclude DACA recipients from the classes of aliens considered to be "lawfully present" for such benefits.[43]  Conversely, recipients of regular grants of deferred action are still considered "lawfully present."[44]  HHS also directed state agencies to make the same distinction of DACA recipients for Medicaid benefits.[45]  The actions of HHS demonstrate the federal government itself does not consider DACA recipients to be similarly situated to recipients of regular deferred action for purposes of benefits eligibility.

2.   **USCIS Has Determined that DACA Recipients Are Not Similarly Situated to Recipients of Regular Deferred Action.**

Section 8 C.F.R. § 274a.12 of the Code of Federal Regulations governs employment authorization for aliens.  Those aliens authorized to accept employment

---

[42] *See* Appendix A12, at 45 C.F.R. § 152.2(4)(vi); Appendix A14, pp. 4, 11.

[43] See Appendix A12 at Fed. Reg. 52616; 45 C.F.R. § 152.2(8).

[44] *Id.,* at 45 C.F.R. § 152.2(4)(vi).

[45] *See* Appendix A13.

incident to status pursuant to some statutory or regulatory reference, and aliens authorized for employment with a specific employer incident to status, are authorized to accept employment as a matter of right. *See* 8 C.F.R. § 274a.12(a), (b). Conversely, deferred action is part of a category of aliens who do not get employment as a matter of right. 8 C.F.R. § 274a.12(c). Instead, approval for such employment falls within the discretion of USCIS. *See* 8 C.F.R. § 274a.13(a)(1). Employment authorization in this "residual category" is for aliens "who may or may not have any legal status" and can be terminated at any time. *Garcia*, 659 F.3d at 1270.

Although 8 C.F.R. § 274a.12(c) does not distinguish between DACA and regular deferred action, USCIS has chosen to distinguish DACA from regular deferred action. As discussed, aliens seeking EADs must file USCIS form I-765. In order to determine EAD eligibility, USCIS requires that the alien identify the category in which that alien is eligible for employment and then fill in that category. USCIS created a new and separate category for DACA. Whereas regular deferred action recipients check their category as C14, DACA recipients must check their category as C33.[46] The actions of USCIS demonstrate that this federal agency, which is part of DHS, also does not consider DACA recipients to be similarly situated to recipients of regular deferred action.

### 3.   The DACA Program Is Nothing Like Regular Deferred Action.

There is a very good reason for the federal government and the State of Arizona to determine that DACA recipients are not similarly situated to recipients of regular deferred action. DACA is very different from other grants of deferred action, both substantively and in its scope of application.[47]

---

[46] *See* Appendix A15, p. 5.

[47] It is also important to note that even regular deferred action is different from other grants of temporary authorization that are specific to a statute or an enumerated federal power. For example, Section 244 of the INA provides that the Attorney General may designate nations or any foreign state (or a part of such foreign state) as deserving of Temporary Protected Status (TPS). See 8 U.S.C. § 1254a. Similarly Deferred Enforced Departure (DED), a temporary, discretionary, administrative stay of removal granted to aliens from designated countries, which is separate and different from DACA or other deferred action, "emanates from the President's constitutional powers to conduct foreign relations." *See* AFM, Appendix A6, at Chapter 38.2. Conversely, deferred action is an

FENNEMORE CRAIG, P.C.

PHOENIX

1

2

      **a.**     **DACA Orders Deferred Action on an Unprecedented Scale.**

3        As discussed above, the scope of the DACA Program makes it very different from

4  regular grants of deferred action, which historically have only been given on a limited and

5  individualized case-by-case basis.   Secretary Napolitano testified that DHS did not have

6  the power to grant deferred action to an entire class of individuals and that only 900 grants

7  of deferred action were given during all of 2010.   Despite this testimony, the DACA

8  Program makes deferred action possible for over 1.7 million individuals.   Over 350,000

9  such individuals have submitted applications for deferred action in the six months since

10  the program started.   Of those applications, 157,151 are under review and 102,965 have

11  been approved as of December 13, 2012.   Over 12,000 applications have already been

12  submitted in Arizona.   The DACA Program provides for deferred action on a previously

13  unintended and unprecedented scope.

14

15

      **b.**     **The DACA Program Is Substantively Different from Prior Grants of Deferred Action.**

16        DHS has occasionally provided the potential for deferred action to entire classes.

17  Such classes have been created incident to some type of statutory relief or in anticipation

18  of a pending regulatory or statutory change.   These classes include:

19
20

- Deferred action eligibility for a surviving alien spouse, child or parent of a permanent resident member of the armed forces under § 1703 of the National Defense Authorization Act for FY 2004, Pub. L. No. 108-136, 117 Stat. 1392, 1693.

21
22
23

- Deferred action eligibility for certain individuals applying for immigration benefits under the Violence Against Women Act under 8 U.S.C. § 1154(a)(1)(D)(i)(II).

- Deferred action eligibility during interim relief for certain U visa applicants.

24
25

- Notice of deferred action eligibility during interim relief to certain foreign students affected by Hurricane Katrina, published in the federal register.[48]

26
27

act of administrative choice which has no statutory or regulatory basis and which is not subject to judicial review.  *See Reno*, 525 U.S. at 484.

28  [48] USCIS Press Release, "*USCIS Interim Relief for Foreign Students Adversely Impacted by Hurricane Katrina*" (Nov. 25, 2005)

FENNEMORE CRAIG, P.C.

PHOENIX

- Deferred action eligibility to widows and children of U.S. citizens while legislation to grant them statutory relief was under consideration by Congress.[49]

DACA is distinguishable from these classes, not only by its incomparable scope, but because DACA does not arise incident to statutory or regulatory relief.  In fact, the only relationship the DACA Program has to any form of statutory relief is that it <u>directly conflicts</u> with Congress's repeated refusal to pass the DREAM Act.

Such substantive differences, and the staggering scope of the relief granted to Plaintiffs and the class they purport to represent, demonstrates that two federal agencies (HHS and USCIS) and the State of Arizona were correct to determine that DACA recipients are not similarly situated to recipients of other types of deferred action or temporary authorizations to remain in the United States.  Because Plaintiffs are not similarly situated to these classes that have formerly obtained driver's licenses by submitting EADs, the Court need not proceed any further with its Equal Protection Clause analysis and it should dismiss Count Two of Plaintiffs' Complaint.  *See Christian Gospel Church, Inc.*, 896 F.2d at 1225.

**B.    <u>Rational Basis Review Applies if the Court Chooses to Conduct an Equal Protection Analysis.</u>**

Should the Court determine that Plaintiffs do meet their threshold burden of demonstrating they are similarly situated to recipients of regular grants of deferred action, it must determine the level of review it applies to the Executive Order and ADOT's Policy.  Legislative classifications that disadvantage a "suspect class" or that tread upon the exercise of a "fundamental right" are reviewed under the strict scrutiny standard.  *City of Cleburne v. Cleburne Living Ctr.,* 473 U.S. 432, 439-40 (1985).   If the state classification does not involve a suspect class or a fundamental right, the classification is

---

http://www.uscis.gov/files/pressrelease/F1Student_11_25_05_PR.pdf,      attached      as Appendix A17.

[49]Memorandum from Donald Neufeld, Subject: "*Guidance Regarding Surviving Spouses of Deceased U.S. Citizens and their Children,*" (June 15, 2009), http://www.uscis.gov/USCIS/Laws/Memoranda/2009/June%202009/surviving-spouses-deferred-action-guidance.pdf, attached as Appendix A18.

FENNEMORE CRAIG, P.C.

PHOENIX

1    reviewed under the rational basis standard. *Nordlinger v. Hahn*, 505 U.S. 1, 10 (1992).

2            **1.    The Matter Does Not Involve a Fundamental Right.**

3            Plaintiffs do not allege that Defendants have violated any specific "fundamental

4    right." They contend, however, that the Executive Order and ADOT's Policy "deny

5    driver's licenses to Plaintiffs . . . rights secured to them under the U.S. Constitution and

6    laws." Compl., ¶ 61. Plaintiffs cannot demonstrate that any of their fundamental rights

7    have been violated.

8            First, it is well-established that there is no constitutional right to a driver's license.

9    *See, e.g.*, *Miller*, 176 F.3d at 1204 (no "fundamental right to drive"; without a driver's

10   license, the plaintiff is denied only "a single mode of transportation—in a car driven by

11   himself"); *Raper v. Lucey*, 488 F.2d 748, 751 (1st Cir. 1973) ("[W]e may take it as settled

12   that . . . a right [to a driver's license] . . . does not exist."); *Harris v. Singh*, No. 12-476,

13   2012 WL 5467856, at *4 (W.D. Pa.  Oct. 23, 2012) ("[A] person does not have a

14   constitutional right to a driver's license.").

15           Second, Defendants' actions do not infringe on the fundamental right to interstate

16   travel because they do not affect: (1) the right of a citizen of one State to enter and to

17   leave another State; (2) the right to be treated as a welcome visitor when temporarily

18   present in the second State; or (3) for travelers who elect to become permanent residents,

19   the right to be treated like other citizens of that State.  *See Saenz v. Roe*, 526 U.S. 489, 500

20   (1999).

21           Third, the constitutionally-protected right to travel does not embody a right to a

22   driver's license or to any particular mode of transportation.  In *John Doe No. 1*, the court

23   considered whether denying a driver's license to those who lacked authorization from the

24   federal government affected an illegal alien's fundamental right to travel.  147 F. Supp. 2d

25   at 1370.  *Id.*  The court concluded that, even if illegal aliens had a fundamental right to

26   travel (which the court did not believe they did), the Georgia statute did not infringe on

27   this right by adding certain limitations to driver's licenses because "the denial of a single

28   mode of transportation does not rise to the level of a violation of the fundamental right to

FENNEMORE CRAIG, P.C.
PHOENIX

interstate travel." *Id.* at 1375; *see also McGhee v. McCall*, No. 1:10-CV-333, 2010 WL 2163818, at *2 (W.D. Mich. Apr. 19, 2010) ("State driver's license laws impose only an 'incidental and negligible' burden on the exercise of right to travel, a burden insufficient to implicate denial of the right.").

### 2.   Plaintiffs Are Not a "Suspect Class."

"[T]he fact that all persons, aliens and citizens alike, are protected by the Due Process Clause does not lead to the further conclusion that all aliens are entitled to enjoy all the advantages of citizenship or, indeed, to the conclusion that all aliens must be placed in a single homogeneous legal classification." *Mathews v. Diaz*, 426 U.S. 67, 78 (1976). Although Equal Protection jurisprudence has applied strict scrutiny to certain laws that discriminate against congressionally authorized classes of aliens, illegal aliens are not a suspect class. *Alcaraz v. Block*, 746 F.2d 593, 605 (9th Cir. 1984).

### C.   Defendants' Decision Not to Issue Driver's Licenses to DACA Recipients Has a Rational Basis.

ADOT's decision not to issue driver's licenses to DACA recipients complies with the Equal Protection Clause because there is a rational relationship between the difference in treatment and some legitimate governmental purpose. *See Heller*, 509 U.S. at 319-20. Importantly, "rational-basis review in equal protection analysis is not a license for courts to judge the wisdom, fairness, or logic of legislative choices," and as such, there is a strong presumption of validity when a state law or policy is analyzed under rational basis review. *Id.* at 319 (internal citation and quotation marks omitted). In fact, a defendant is not required to employ the best means of achieving the legitimate state interest. *Id.* at 321. The Equal Protection Clause only requires that Defendants reasonably believed that the means chosen would promote the purpose. *W. & S. Life Ins. Co. v. State Bd. of Equalization*, 451 U.S. 648, 668 (1981). "As long as the classificatory scheme chosen . . . rationally advances a reasonable and identifiable governmental objective, [the Court] must disregard the existence of other methods of allocation that [it] perhaps would have preferred." *Schweiker v. Wilson*, 450 U.S. 221, 235 (1981).

1    Plaintiffs incorrectly attempt to place the burden on Defendants to justify their

2    actions.  *See* Compl., ¶ 97 ("Defendants cannot establish that Executive Order 2012-06

3    and related policies and practices have any valid justification, including even a rational

4    basis.").  Defendants, however, have no obligation to "articulate at any time the purpose

5    or rationale supporting its classification" or to produce any evidence to sustain the

6    rationality of its actions.  *Heller*, 509 U.S. at 320. ("A legislative choice is not subject to

7    courtroom factfinding and may be based on rational speculation unsupported by evidence

8    or empirical data.").[50]    Rather, it is Plaintiffs' burden to negate each and every

9    conceivable basis which might support the Executive Order and ADOT's Policy.   *Id.*

10    Here, ***Defendants' determination that DACA recipients are not entitled to***

11    ***driver's licenses under A.R.S. § 28-3153(D) must survive review when the federal***

12    ***government has distinguished DACA from regular deferred action for the exact same***

13    ***reasons as the State of Arizona.***  HHS relied on DHS's own language to determine that,

14    because DACA conferred no substantive rights but was designed to ease the strain on

15    DHS's resources, DACA recipients were not "lawfully present" for purposes of eligibility

16    to certain benefits under the Affordable Health Care Act and Medicare.

17    Defendants likewise determined that, because the purposes behind the DACA

18    program have nothing to do with benefits eligibility, DACA recipients do not have

19    authorized presence and, therefore, should not obtain the benefit of an Arizona driver's

20    licenses, or the access a driver's license provides to certain public benefits.  Given the

21    scope of the DACA Program and the size of the class of potential DACA recipients in

22    Arizona, Defendants' distinction between EADs issued under the DACA Program and

23    other EADs is rationally related to Arizona's strong state interest in: (1) avoiding the risk

24

---

25    [50] Under this standard, the Court can dismiss Plaintiffs' Equal Protection Claim under

26    Rule 12(b)(6) because Defendants do not need to submit evidence to support the rational basis behind their classification of DACA recipients.  Notwithstanding, Defendants have submitted the Declaration of Director Halikowski, attached to Defendants' Separate

27    Statement of Facts, to explain Defendants' actions in order to move on the alternative basis that summary judgment is warranted on Plaintiffs' Equal Protection Claim as a

28    matter of law.

FENNEMORE CRAIG, P.C.

PHOENIX

1    of potential liability for the State and ADOT; (2) reducing the risk that driver's licenses

2    provide improper access to public benefits, (3) unduly burdening ADOT with being

3    required to process an extremely large number of applications for licenses from a group

4    that is not lawfully authorized to be in the State, or having to revoke those licenses if the

5    DACA program itself is revoked; and (4) avoiding the risk that DACA recipients might

6    not be financially responsible for property damage or personal injury caused by

7    automobile accidents should the DACA Program become revoked and those individuals

8    become subject to immediate deportation and/or are removed from the United States.

9         Defendants' actions cannot be a violation of the Equal Protection Clause when the

10   federal government itself has made the same distinction for similar expressed legitimate

11   and substantial governmental interests.  Judgment in Defendants' favor is warranted on

12   Plaintiffs' Equal Protection Claim.

13        **1.    ADOT Faces Potential Liability for Issuance of 80,000 Licenses if**
          **DACA Recipients' Presence is Not Authorized under Federal**
14        **Law.**

15        As discussed, DACA is substantively different than regular deferred action and

16   different in the unprecedented scope of its application.   Director Halikowski was

17   concerned that ADOT might face liability for issuing 80,000 driver's licenses to illegal

18   immigrants, or from not cancelling those driver's licenses quickly enough, if their

19   presence is not actually authorized under federal law.  The State of Arizona has a history

20   of defending itself from lawsuits arising from the alleged improper issuance of driver's

21   licenses.  *See e.g.*, *Evenstad v. State*, 178 Ariz. 578, 585, 875 P.2d 811, 818 (App. 1993)

22   (holding that ADOT may be held liable for the issuance of driver's licenses); *see also*

23   *State v. Superior Court*, 140 Ariz. 365, 681 P.2d 1384 (1984) (wrongful death suit against

24   State for issuing a driver's license to a driver with disabilities); *Oleszczuk v. State*, 124

25   Ariz. 373, 604 P.2d 637 (1979) (same).  The Director's concern was therefore legitimate.

26        **2.    Issuing Driver's Licenses to DACA Recipients Could Lead to**
          **Wide-scale and Improper Access to Certain Federal and State**
27        **Public Benefits.**

28        Possession of an Arizona driver's license is a form of identification that can enable

its holder to access federal and state public benefits.  In Arizona, an applicant for a state or local public benefit can submit an Arizona driver license issued after 1996 to demonstrate lawful presence and benefits eligibility. A.R.S. § 1-502.  Likewise, an applicant for a federal public benefit requiring participants "to be citizens of the United States, legal residents of the United States or otherwise lawfully present in the United States" must submit documentation demonstrating lawful presence in the United States.  *See* A.R.S. § 1-501.  An Arizona driver license issued after 1996 meets this standard.  *Id*.  These statutory requirements comport with federal legislation.  Under the Federal Welfare Reform Act, illegal immigrants are generally not eligible for state or local public benefits. *See* 8 U.S.C. § 1621.

The Executive Order plainly states the legitimate state interest in ensuring DACA recipients do not improperly gain access to state benefits to which they are not entitled. The DACA Memo affirms that a grant of deferred action under the DACA Program did not provide any right to substantive benefits.  *See* Appendix A10 ("This memorandum confers no substantive right.").  Giving driver's licenses to DACA recipients risks such individuals improperly using those driver's licenses to obtain public benefits to which they are not entitled.

Prior to DACA, ADOT accepted EADs as evidence of authorized presence in the United States.  ADOT has only recently become aware that some quantity of those EADs might have been submitted by individuals granted regular deferred action.  ADOT is currently determining exactly how many drivers licenses were issued to deferred action recipients who provided an EAD as the sole evidence of authorized presence.

Defendants expect to find that ADOT gave a very limited amount of driver's licenses to regular deferred action recipients in past years. SOF, ¶ 32.  Only 900 grants of deferred action were given nationwide during 2010.  Arizona makes up 2.1% of the United States population.[51]  Therefore, using these numbers as a rough estimate, only 19

---

[51] *See* U.S. Census Bureau, "*Table 1, Estimates of Resident Population, Population Change, Percent Distribution, and Population Density for the United States, States, a*nd Puerto Rico: April 1, 2010 to July 1, 2012,"

FENNEMORE CRAIG, P.C.

PHOENIX

of the 900 grants of deferred action in 2010 occurred in Arizona.  Even if each of those 19 obtained EADs with no other lawful immigration status conferred by Congress and applied for a driver's license, the total amount is very insignificant.[52]

Conversely, 80,000 individuals in Arizona are eligible to DACA relief.  If those individuals obtained drivers licenses, the risk of wholesale improper access to public benefits would be enormous.  Giving 80,000 non-entitled individuals access to public benefits would be contrary to federal and state law and would constitute an unimaginable drain on Arizona's tax base and the administrative resources necessary to verify benefits were not illegally being provided.

### 3. ADOT Faces Significant Consequences from Issuing Driver's Licenses if the DACA Program is Subsequently Revoked.

In addition to the risk of increased improper access to public benefits on a magnitude never before seen, Director Halikowski had additional strong state interests in mind when he made the policy determination, pursuant to his statutory authority that ADOT would not accept EADs given to DACA recipients as evidence of authorized presence under federal law.  ICE's Detention and Removal Operations Policy and Procedure Manual provides that deferred action confers no protection or benefit on an alien and does not preclude DHS from commencing removal proceedings at any time against an alien.[53]

In addition to facing the burden of issuing up to an additional 80,000 licenses in a

---

http://www.census.gov/popest/data/maps/12maps.html, attached as Appendix A19.

[52] Defendants concede this statistical analysis is not thoroughly scientific.  An alternative way to make the estimation would be to look at the percentage of DACA applications that have so far come from Arizona.  Of the 355,889 DACA applications received to date, 12,924 arose in Arizona.  Therefore, individuals in Arizona make up 3.63% of the DACA applicants.  Using these statistics to determine the percentage of the 900 nationwide deferred action grants that might have occurred in Arizona in 2010 would give a total of 33.  Although these statistics analyses may not be entirely scientific, the underlying principle is obvious.  There is a huge difference between the prior issuance of driver's license to 19 or 33 regular deferred action recipients in Arizona and the issuance of 80,000 driver's licenses to Arizona DACA recipients.

[53] See Appendix A7 at §20.9(a).

FENNEMORE CRAIG, P.C.

PHOENIX

- 38 -

1    short period of time, Director Halikowski faced the unpalatable possibility of issuing

2    licenses to 80,000 individuals whose temporary reprieve from removal proceedings could

3    be revoked at any time.  If Congress were to act to invalidate the DACA program or adopt

4    a program for dealing with this group of illegal aliens that differs substantially from the

5    DACA Program, ADOT will be faced with the serious problem of dealing with licenses

6    issued under the program.

7           Although ADOT could cancel pre-existing Arizona driver's licenses that had been

8    issued to DACA recipients, ADOT would have no practical and meaningful way to

9    require recipients to actually surrender them.  It would also be impossible to unwind the

10   access to public benefits that ADOT's issuance of driver's licenses had already created.

11          Most important, if DACA is revoked and its recipients become subject to

12   immediate deportation and/or are removed from the United States, there exists the

13   likelihood they will not be financially responsible for any property damage or personal

14   injury they caused in automobile accidents while driving with a license.  ***This concern***

15   ***alone has been found to be a legitimate state interest in not issuing driver's licenses to***

16   ***illegal immigrants under rational basis review.***  *See John Doe No. 1*, 147 F. Supp. 2d at

17   1376 ("The State has a legitimate interest in restricting Georgia driver's licenses to those

18   who are citizens or legal residents because of the concern that persons subject to

19   immediate deportation will not be financially responsible for property damage or personal

20   injury due to automobile accidents."); *Sanchez v. State*, 692 N.W.2d 812, 818 (Iowa 2005)

21   (recognizing the State of Iowa's same proffered legitimate interest in regulating driver's

22   licenses for illegal aliens).

23          For the reasons stated above, Defendants' classification of DACA recipients as

24   different from other EAD holders (even those under regular deferred action) is rationally

25   related to several substantial state interests.  Judgment is therefore warranted as a matter

26   of law for Defendants on Plaintiffs' Equal Protection Clause Claim.

27   / / /

28   / / /

FENNEMORE CRAIG, P.C.

PHOENIX

**VI.**   **THE COURT SHOULD ACCORD DEFERENCE TO ADOT'S INTERPRETATION OF ARIZONA'S DRIVER'S LICENSE STATUTE TO EXCLUDE DACA RECIPIENTS.**

Defendant Halikowski has broad statutory discretion to administer and enforce Arizona's transportation laws and exercise any duties or powers he deems necessary to carry out the efficient operation of ADOT.  *See* A.R.S. §§ 28-311; 28-363; SOF, ¶ 10. Arizona's driver's license statute gives ADOT the specific discretion to decide what proof is sufficient to establish authorized presence under law.  *See* A.R.S. § 28-3153(D) (applicant must submit ***proof satisfactory to the department***) (emphasis added).[54]   The Court must give substantial deference to a state agency's interpretation of a statute that agency administers.  *See Franklin Mem'l Hosp. v. Harvey*, 532 F. Supp. 2d 204, 209 (D. Me. 2008) (collecting and discussing U.S. circuit court cases that afforded substantial deference).  Such an interpretation cannot be set aside "unless it is arbitrary, capricious, an abuse of discretion, or otherwise not supported by law."  *Enter. Leasing Co. v. Metro. Airports Comm'n,* 250 F.3d 1215, 1223 (8th Cir. 2001).

Many of Plaintiffs' allegations center not on Defendants' classification of DACA recipients as different from other EAD holders, but on whether Defendants may reasonably interpret Arizona's driver's license statute to exclude DACA recipients.  *See, e.g.*, Compl., ¶¶ 39-40 (alleging that DACA recipients are authorized to be present during the two year deferred action period and are  likewise lawfully present); ¶ 46 ("the Executive Order thus provides that deferred action recipients are unable to meet the 'authorized' presence requirement for driver's licenses and identification.").  Whether ADOT's interpretation of the term "authorized presence under federal law" is consistent with that term as used in an Arizona statute is not an issue of whether the Defendants' actions comply with the Equal Protection Clause or whether their decisions are preempted

---

[54] Taken to its logical conclusion, this plain language alone gives ADOT the discretion to determine that, although any EAD was formerly sufficient proof to establish authorized presence,  DACA EADs are not sufficient proof due to the huge difference DACA and regular deferred action. Notably, USCIS also decided to make the same distinction when it created a new category to distinguish DACA from regular deferred action on the I-765 form which deals with applications for EADs. *See* Appendix A15, page 5.

FENNEMORE CRAIG, P.C.

PHOENIX

by federal law.  They are issues of whether Defendants have complied with State law, and Plaintiffs have brought no such claim before this Court.

### A.   Defendants May Reasonably Determine that DACA Does Not Grant "Authorized" or "Lawful" Presence under Federal Law."

To support their allegation that DACA recipients are "lawfully present" during deferred action, Plaintiffs rely on the USCIS statement that under the DACA Program, "if your case is deferred, you will not accrue unlawful presence during the period of deferred action." Compl., ¶ 40.  Plaintiffs' argument is flatly rejected by the USCIS Adjudicator's Field Manual ("AFM")[55] which expressly states "*the fact the alien does not accrue unlawful presence does not mean that the alien's presence in the United States is actually lawful.*"[56]  Moreover, a DHS spokesperson, Peter Boogaard, recently confirmed, in specific reference to this lawsuit, that DHS's decision not to try to deport some people does not actually "authorize" them to be in the United States.  SOF, ¶ 40.  If DHS itself has said that deferred action and DACA does not lead to authorized or lawful presence, then the State of Arizona can reasonably made the same determination with regard to driver's license eligibility.

### B.   Defendants May Reasonably Determine the DACA Program Does Not "Arise Under Federal Law."

Plaintiffs allege that Secretary Napolitano's authority to grant deferred action to otherwise removable noncitizens derives from her statutory authority over administration and enforcement of the INA.  Compl., ¶ 30 (internal citations omitted).  Even if DHS's administrative choice to exercise "prosecutorial discretion" not to enforce the nation's immigration laws comes from the INA and therefore arises "under federal law," such prosecutorial discretion exists and is intended for individualized application on a case-by-

---

[55] The AFM is "a comprehensive 'how to' manual detailing policies and procedures for all aspects of [USCIS's] Adjudications Program.  The AFM is intended to be used [by USCIS adjudicators] in conjunction with other reference material such as the Immigration and Nationality Act and Title 8 of the Code of Federal Regulations." AFM, Appendix A6, at Chapter 1.1.

[56] *Id.*, at Chapter 40.9.2(a)(2) (emphasis added).

1    case basis.  As discussed *supra,* Secretary Napolitano herself testified before Congress

2    that her authority to grant deferred action does not extend to granting deferred action to an

3    entire class.  If it did, she could refuse to enforce any immigration laws and thereby create

4    her own immigration policy and laws simply through the use of prosecutorial discretion.

5    It is therefore reasonable for Defendants to similarly determine that the DACA Program,

6    in Senator Grassley's words, goes "way beyond"[57] the concept of regular deferred action

7    and does not "arise under federal law."

8    **VII.    <u>CONCLUSION</u>**

9         The Court should enter an order dismissing Plaintiffs' claims for violation of the

10   Supremacy Clause with prejudice.  Those claims do not, and cannot, state a claim upon

11   which relief may be granted.  The Court should also enter an order dismissing Plaintiffs'

12   Equal Protection Claim for the same reasons, or, in the alternative, granting Defendants

13   judgment on Plaintiffs' Equal Protection Claim because the record reveals no genuine

14   issue of material fact, and Defendants are entitled to judgment as a matter of law.

15        DATED this 9th day of January, 2013.

16                                                 FENNEMORE CRAIG, P.C.

17

18                                                 By   *s/ Douglas C. Northup*
                                                         _____
19                                                       Douglas C. Northup
                                                         Timothy Berg
20                                                       Sean T. Hood
                                                         Attorneys for Defendants
21                                                       Governor Janice K. Brewer, John S.
                                                         Halikowski and Stacey K. Stanton
22
                                                         - and -
23
                                                         Joseph Sciarrotta, Jr.
24                                                       Office of Governor Janice K. Brewer
                                                         Co-Counsel for Defendant
25                                                       Governor Janice K. Brewer

26

27

28    _____
      [57] *See* Appendix A8, p. 32.

FENNEMORE CRAIG, P.C.

PHOENIX

1

**CERTIFICATE OF SERVICE**

2

I hereby certify that on January 9, 2013, I electronically transmitted the attached

3

document to the Clerk's Office using the ECF System for filing and transmittal of a Notice of Electronic Filing to the following ECF registrants:

4

Jennifer Chang Newell

Cecillia D. Wang

5

Michael Tan

R. Orion Danjuma

6

American Civil Liberties Union Foundation

Immigrants' Rights Project

7

39 Drumm Street

San Francisco, CA  94111

8

Email:  jnewell@aclu.org

Email:  cwang@aclu.org

9

Email:  mtan@aclu.org

Email:  odanjuma@aclu.org

10

11

Lee Gelernt

American Civil Liberties Union Foundation

Immigrants' Rights Project

12

125 Broad St., 18th Floor

New York, NY  1004

13

Email:  lgelernt@aclu.org

14

Daniel J. Pochoda

Kelly J. Flood

15

James Duff Lyall

ACLU Foundation of Arizona

16

3707 N. Seventh St., Suite 235

Phoenix, AZ  85014

17

Email:  dpochoda@acluaz.org

Email:  kflood@acluaz.org

18

Email:  jlyall@acluaz.org

19

Linton Joaquin

Karen C. Tumlin

20

Shiu-Ming Cheer

National Immigration Law Center

21

3435 Wilshire Blvd., Suite 2850

Los Angeles, CA  90010

22

Email:  joaquin@nilc.org

Email:  tumlin@nilc.org

23

Email:  cheer@nilc.org

24

Tanya Broder

National Immigration Law Center

25

405 Fourteenth St., Suite 1400

Oakland, CA 94612

26

Email:  Broder@nilc.org

27

28

FENNEMORE CRAIG, P.C.

PHOENIX

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

Victor Viramontes
Nicholas Espiritu
Mexican American Legal Defense and Educational Fund
634 S. Spring Street, 11th Floor
Los Angeles, CA  90014
Email:  vviramontes@maldef.org
Email:  nespiritu@maldef.org

Marty Harper
Thomas K. Irvine
Andrew S. Jacob
Polsinelli Shughart P.C.
One E. Washington St., Suite 1200
Phoenix, AZ  85004
Email:  mharper@polsinelli.com
Email:  tirvine@polsinelli.com
Email:  ajacob@polsinelli.com



                    *s/ Nikki Nolund*
                   Legal Secretary
                   Fennemore Craig, P.C.

7840656

FENNEMORE CRAIG, P.C.

PHOENIX