**WO**

IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF ARIZONA

| | |
|---|---|
| Arizona Dream Act Coalition; Jesus Castro-Martinez; Christian Jacobo; Alejandro Lopez; Ariel Martinez; and Natalia Perez-Gallagos,<br><br>                    Plaintiffs,<br><br>v.<br><br>Janice K. Brewer, Governor of the State of Arizona, in her official capacity; John S. Halikowski, Director of the Arizona Department of Transportation, in his official capacity; and Stacey K. Stanton, Assistant Director of the Motor Vehicle Division of the Arizona Department of Transportation, in her official capacity,<br><br>                    Defendants. | No. CV12-02546 PHX DGC<br><br>**ORDER** |

This case concerns the constitutionality of the State of Arizona's denial of driver's licenses to persons commonly known as "DREAMers."[1]  On June 15, 2012, Janet Napolitano, Secretary of the Department of Homeland Security ("DHS"), announced the Deferred Action for Childhood Arrivals ("DACA") program, which provides deferred action for a period of two years to certain eligible DREAMers (hereafter referred to as

---

[1] Plaintiffs generally refer to themselves as "DREAMers" based on proposed federal legislation known as the Development, Relief, and Education for Alien Minors Act (the "DREAM Act").  Doc. 1, ¶ 2.  The DREAM Act would grant legal status to certain undocumented young adults.  Congress has considered the DREAM Act several times, but no version has been enacted.  *See, e.g.*, DREAM Act of 2011, S. 952, H.R. 1842, 112th Cong. (2011); DREAM Act of 2010, H.R. 6497, S. 3962, S. 3963, 111th Cong. (2010); DREAM Act of 2007, S. 774, 110th Cong. (2007).

"DACA recipients").  Deferred action constitutes a discretionary decision by law enforcement authorities to defer legal action that would remove an individual from the country.  The DACA program also provides that DACA recipients may work during the period of deferred action and may obtain employment authorization documents, generally known as "EADs," from the United States Citizenship and Immigration Services ("USCIS").

Arizona law provides that the Arizona Department of Transportation ("ADOT") "shall not issue to or renew a driver license . . . for a person who does not submit proof satisfactory to the department that the applicant's presence in the United States is authorized under federal law."  A.R.S. § 28-3153(D).  Before the announcement of the DACA program, the Motor Vehicle Division ("MVD") of ADOT accepted all federally-issued EADs as sufficient evidence that a person's presence in the United States was authorized under federal law, and therefore granted driver's licenses to such individuals.  After announcement of the DACA program, MVD revised its policy to provide that EADs issued to DACA recipients do not constitute sufficient evidence.  MVD continues to accept all other EADs, including those issued to persons who have received other forms of deferred action.

Plaintiffs are the Arizona Dream Act Coalition ("ADAC"), an immigrant youth-led community organization, and five individual DACA recipients.  They allege that Defendants' driver's license policy violates the Supremacy and the Equal Protection Clauses of the United States Constitution.  Plaintiffs have filed a motion for preliminary injunction (Doc. 29), and Defendants have filed a motion to dismiss (Doc. 58).  The motions are fully briefed, and the Court heard oral argument on March 22, 2013.  For reasons stated below, the Court concludes that Plaintiffs have not shown a likelihood of success on the merits of their Supremacy Clause claim.  Plaintiffs have shown a likelihood of success on the merits of their equal protection claim, but the Court finds that they have not shown a likelihood of irreparable injury and have not otherwise met the high burden for a mandatory injunction.  The Court accordingly will deny Plaintiffs'

1    motion for a preliminary injunction and grant Defendants' motion to dismiss in part.

2                                    **BACKGROUND**

3    **I.    Deferred Action and DACA.**

4              The federal government has broad and plenary powers over the subject of

5    immigration and the status of aliens.  *Arizona v. United States*, 132 S. Ct. 2492, 2498

6    (2012); *see also* U.S. Const. art. I, § 8, cl. 4.  Through the Immigration and Nationality

7    Act ("INA"), 8 U.S.C. § 1101, *et seq.*, Congress has created a complex and detailed

8    federal immigration scheme governing the conditions under which a foreign national may

9    be admitted to and remain in the United States, *see, e.g.*, *id.* §§ 1181, 1182, 1184, and

10   providing for the removal and deportation of aliens not lawfully admitted to this country,

11   *see, e.g.*, *id.* §§ 1225, 1227, 1228, 1229, 1231.  *See generally United States v. Arizona*,

12   703 F. Supp. 2d 980, 987-88 (D. Ariz. 2010) (describing the federal immigration

13   scheme).  The INA charges the Secretary of Homeland Security with the administration

14   and enforcement of all laws relating to immigration and naturalization.   8 U.S.C.

15   § 1103(a)(1).  Under this delegation of authority, the Secretary may exercise a form of

16   prosecutorial discretion and decide not to pursue the removal of a person unlawfully in

17   the United States.  This exercise of prosecutorial discretion is commonly referred to as

18   deferred action.  *See Reno v. Am.-Arab Anti-Discrimination Comm.*, 525 U.S. 471, 483-

19   84 & n. 8 (1999) (recognizing the practice of "deferred action" where the Executive

20   exercises discretion and declines to institute proceedings, terminate proceedings, or

21   execute a final order of deportation for humanitarian reasons or its own convenience).[2]

22             On June 15, 2012, Secretary Napolitano issued a memorandum announcing that

23   _____

24             [2] Deferred action status can be granted for a number of reasons.  For example,
     deferred action status can be granted to undocumented aliens who are witnesses in a
25   criminal case, permitting them to remain and work in the United States until they testify
     at trial, after which they will be removed.  Doc. 30 at 10 (citing Doc. 32, ¶¶ 17-19);
26   Doc. 32, ¶ 28; Doc. 83-1, ¶ 27.  Other examples include "victims of human trafficking
     and sexual exploitation"; "relatives of victims of terrorism"; "surviving family members
27   of a lawful permanent resident member of the armed forces"; "spouses and children of
     U.S. citizens or lawful permanent residents who are survivors of domestic violence";
28   "surviving spouses of U.S. citizens"; "foreign students affected by Hurricane Katrina";
     and "applicants for certain types of visas."   Doc. 30 at 10 (citing Doc. 40, ¶¶ 13-19);
     Doc. 32, ¶¶ 19, 28; Doc. 83-1, ¶¶ 25-38.  *See generally* Doc. 86-2 at 67-79, 82-85.

1  certain young persons not lawfully present in the United States will be eligible to obtain

2  deferred action if they meet specified criteria under the newly instituted DACA program.

3  Doc. 1, ¶¶ 4-5; Doc. 38-3.  Eligible persons must show that they (1) came to the United

4  States under the age of 16; (2) continuously resided in the United States for at least five

5  years preceding the date of the memorandum and were present in the United States on the

6  date of the memorandum; (3) currently attend school, have graduated from high school or

7  obtained a general education development certificate, or are an honorably discharged

8  veteran of the Coast Guard or Armed Forces of the United States; (4) have not been

9  convicted of a felony offense, a significant misdemeanor, multiple misdemeanor

10 offenses, or otherwise pose a threat to national security or public safety; and (5) are not

11 older than 30.  Doc. 38-3 at 2.  Eligible persons receive deferred action for two years,

12 subject to renewal, and may obtain an EAD for the period of the deferred action.

13 Doc. 38-3 at 4; *see also* 8 C.F.R. § 274a.12(c)(14).  The Napolitano memorandum makes

14 clear that it "confers no substantive right, immigration status or pathway to citizenship[,]"

15 and that "[o]nly the Congress, acting through its legislative authority, can confer these

16 rights."  *Id.*  An estimated 1.76 million persons are eligible for DACA, with

17 approximately 80,000 residing in Arizona.  Doc. 1, ¶ 6.

18 **II.   Defendants' Driver's License Policy.**

19          As noted above, A.R.S. § 28-3153(D) provides that non-citizens may obtain

20 Arizona driver's licenses by presenting proof that their presence in the United States is

21 authorized by federal law.  MVD policies identify the documentation deemed sufficient

22 to show federal authorization.  *See* Doc. 34-3.  Before the policy change at issue in this

23 case, MVD accepted EADs as satisfactory evidence.   Doc. 1, ¶ 9; Doc. 34-3; Doc. 60-1

24 at 12-15, ¶ 25; Doc. 83-5, ¶ 3.  Between 2005 and 2012, MVD issued approximately

25 47,500 driver's licenses to persons who submitted EADs to prove their lawful presence in

26 the United States.  Doc. 30 at 26 (citing Doc. 34-7 at 1-5).[3]

27 

28          [3] Defendants report that "after removing the duplicate records" (Doc. 83-5, ¶ 14),
the number is actually 38,831 (Doc. 90 at 23, n. 34).  Elsewhere, Defendants submit a
news article stating that a review of MVD records "found more than 68,000 instances

The announcement of the DACA program prompted ADOT Director John S. Halikowski to review the program's potential impact on ADOT's administration of the State's driver's license laws.  Doc. 60-1 at 12-15, ¶¶ 5, 7.  Halikowski and Assistant Director Stacey K. Stanton were aware that DACA recipients with EADs were eligible to receive driver's licenses under MVD's then-existing policy (Doc. 99-1 at 247-51[4]), and Halikowski's declaration states that he had a number of concerns about the DACA program (Doc. 60-1 at 12-15, ¶¶ 8-20).

After Director Halikowski initiated the ADOT policy review, but before the review had reached a conclusion, Governor Brewer issued Executive Order 2012-06 on August 15, 2012 (the "Executive Order").  The Executive Order concluded that "issuance of Deferred Action or Deferred Action USCIS employment authorization documents to unlawfully present aliens does not confer upon them any lawful or authorized status and does not entitle them to any additional public benefit."  Doc. 1-1 at 2.  The Executive Order directed state agencies to "conduct a full statutory, rule-making and policy analysis and . . . initiate operational, policy, rule and statutory changes necessary to prevent Deferred Action recipients from obtaining eligibility, beyond those available to any person regardless of lawful status, for any taxpayer-funded public benefits and state identification, including a driver's license[.]"  *Id.*  Governor Brewer stated that the Executive Order was necessary to make clear there would be "no drivers [sic] licenses for illegal people."  Doc. 38, ¶ 13.  On September 17, 2012, MVD formally revised its policy to conform to the Governor's order.  Doc. 1, ¶ 10; Doc. 1-2.

---

since 2005 where MVD issued an Arizona driver's license or state ID card to someone with a federal 'employment authorization card.'"  Doc. 60-1 at 29.  For purposes of this order, the Court will use 47,500 as a reasonable approximation.

[4] Some citations in this order are to documents lodged by the parties under seal to protect information claimed to be confidential.  The Court has issued an order directing the parties to resolve their disagreements on what portions of the record should be sealed, and to submit a stipulation to the Court.  The Court has decided not to await resolution of that matter before issuing this order.

## MOTION FOR PRELIMINARY INJUNCTION

### I.     Legal Standard.

"A preliminary injunction is an extraordinary remedy never awarded as a matter of right."  *Winter v. Natural Res. Def. Council, Inc.*, 555 U.S. 7, 24 (2008) (citation omitted).  To obtain a preliminary injunction, a plaintiff must show "that he is likely to succeed on the merits, that he is likely to suffer irreparable harm in the absence of preliminary relief, that the balance of equities tips in his favor, and that an injunction is in the public interest."  *Id.* at 20; *see also Alliance for the Wild Rockies v. Cottrell*, 632 F.3d 1127, 1135 (9th Cir. 2011).

Preliminary injunctions can be prohibitory or mandatory.  Prohibitory injunctions "preserve the status quo between the parties pending a resolution of a case on the merits." *McCormack v. Hiedeman*, 694 F.3d 1004, 1019 (9th Cir. 2012) (citation omitted). Mandatory injunctions go well beyond maintaining the status quo and order responsible parties "to take action."  *Marlyn Nutraceuticals, Inc. v. Mucos Pharma GmbH & Co.*, 571 F.3d 873, 879 (9th Cir. 2009) (quotation marks and citations omitted).  Because they impose affirmative obligations on parties at the very beginning of a case and before full discovery or a trial on the merits, mandatory injunctions require a higher level of proof than prohibitory injunctions.  They are "particularly disfavored," not granted unless "extreme or very serious damage will result," and "not issued in doubtful cases."  *Park Village Apt. Tenants Ass'n v. Mortimer Howard Trust*, 636 F.3d 1150, 1160 (9th Cir. 2011) (quoting *Marlyn Nutraceuticals*, 571 F.3d at 879); *see also Dahl v. HEM Pharmaceuticals Corp.*, 7 F.3d 1399, 1403 (9th Cir. 1993) ("'mandatory preliminary relief' is subject to heightened scrutiny and should not be issued unless the facts and law clearly favor the moving party.").

Plaintiffs ask the Court to enjoin Defendants from continuing to apply their DACA-specific driver's license policy, an injunction that would result in Plaintiffs receiving driver's licenses when they present EADs and otherwise qualify for licenses. The parties disagree on whether such an injunction would be prohibitory or mandatory.

1  Plaintiffs claim that it is prohibitory because it merely seeks to prohibit Defendants from
2  applying an unconstitutional policy.  Defendants argue that it is mandatory because it
3  would require them to take action they have not taken in the past – issuing driver's
4  licenses to Plaintiffs and member of their class.

5          The Court finds that the requested injunction is mandatory.  As the Ninth Circuit
6  has explained, the test for whether an injunction is prohibitory or mandatory can be found
7  in its effect on the "status quo ante litem," which means "'the last, uncontested status
8  which preceded the pending controversy.'"  *Marlyn Nutraceuticals*, 571 F.3d at 879
9  (quoting *Regents of the Univ. of Cal. v. Am. Broad. Cos.,* 747 F.2d 511, 514 (9th Cir.
10  1984)).  The status quo referred to, of course, is the status quo between the parties to the
11  lawsuit.  As the Ninth Circuit has noted, a prohibitory injunction "preserve[s] the status
12  quo *between the parties* pending a resolution of a case on the merits."  *McCormack*, 694
13  F.3d at 1019 (emphasis added); *see also Stanley*, 13 F.3d at 1320 (examining relationship
14  between parties to decide whether injunction was prohibitory or mandatory).

15          The last uncontested status between the parties to this case was that Defendants
16  did not issue driver's licenses to Plaintiffs.  Although it is true that Defendants previously
17  accepted EADs as sufficient proof for issuing licenses to other individuals, that prior
18  circumstance did not exist between the parties to this case.  Before implementation of the
19  DACA program and issuance of the Executive Order (which occurred on the same date,
20  August 15, 2012), Defendants had never issued licenses to Plaintiffs and Plaintiffs had
21  never sought them.  The requested injunction would change this "status quo ante litem."
22  Defendants would be required to issue driver's licenses to Plaintiffs and other DACA
23  recipients who submit EADs obtained under the DACA program.  Such a change in the
24  preexisting status quo constitutes a mandatory injunction, and the Court therefore will
25  apply the heightened requirements for such injunctions.

26  **II.      Likelihood of Success on the Supremacy Clause Claim (Count One).**

27          "The Supremacy Clause provides a clear rule that federal law 'shall be the
28  supreme Law of the Land; and the Judges in every State shall be bound thereby, anything

in the Constitution or Laws of any State to the Contrary notwithstanding.'" *Arizona*, 132 S. Ct. at 2500 (quoting U.S. Const. art. VI, cl. 2).  Under this rule, "Congress has the power to preempt state law." *Crosby v. Nat'l Foreign Trade Council*, 530 U.S. 363, 372 (2000).  The preemption doctrine consists of three well-recognized classes: express, field, and conflict preemption.  *Arizona*, 132 S. Ct. at 2500-01.  Express preemption occurs when Congress "withdraws specified powers from the States by enacting a statute containing an express preemption provision." *Id.* at 2501 (citing *Chamber of Commerce of U.S. v. Whiting*, 131 S. Ct. 1968, 1974-75 (2011)).  Field preemption precludes states "from regulating conduct in a field that Congress, acting within its proper authority, has determined must be regulated by its exclusive governance." *Id.* (citing *Glade v. Nat'l Solid Wastes Mgmt. Ass'n*, 505 U.S. 88, 115 (1992)). Conflict preemption occurs "where 'compliance with both federal and state regulations is a physical impossibility,' *Florida Lime & Avocado Growers, Inc. v. Paul*, 373 U.S. 132, 142-43 (1963), and in those instances where the challenged state law 'stands as an obstacle to the accomplishment and execution of the full purposes and objectives of Congress,' *Hines v. Davidowitz*, 312 U.S. 52, 61 (1941)." *Id.*

Plaintiffs do not rely on express preemption and say they do not rely on field preemption.  Plaintiffs instead argue that the Arizona policy is "*per se* preempted" and conflict preempted.  The Court finds both arguments to be legally incorrect.

### A.   *Per Se* Preemption.

Plaintiffs argue that Defendants' policy amounts to a regulation of immigration and is *per se* pre-empted under *De Canas v. Bica*, 424 U.S. 351 (1976), and other Supreme Court decisions.  Plaintiffs focus specifically on the State's act of "classifying" aliens – saying that some aliens get driver's licenses and others do not – and argue that such classification by a state is preempted by the federal government's sole right to classify aliens.   As the Court noted above, however, the traditionally recognized categories of preemption are express, field, and conflict.  *Arizona*, 132 S. Ct. at 2500-01. *Per se* preemption is not included in the list.  Plaintiffs seem to be crafting a specialized

kind of preemption that applies only in immigration cases and forbids any state law or action that can be construed as a "classification" of aliens.  The Supreme Court cases cited by Plaintiffs do not support this specialized argument.

*De Canas* involved a challenge to a California law that prohibited employers from knowingly employing "an alien who is not entitled to lawful residence in the United States if such employment would have an adverse effect on lawful resident workers." 424 U.S. at 352.  The Supreme Court declined to invalidate the law, and in the process reached three conclusions:   (1) The Constitution does not so restrict the field of immigration regulation as to prohibit any state law that deals with aliens, *id.* at 355-56; (2) Congress has not so occupied the field of immigration regulation as to preclude all state regulation, *id.* at 357-58; and (3) deciding whether the California law conflicted with federal immigration law required construction of the California statute and implementing regulations, a matter that should be addressed in the first instance by the California courts, *id.* at 363-65.  The case was remanded to the California courts for this purpose.  *Id.* at 365.  Thus, contrary to Plaintiffs' suggestion, *De Canas* did not adopt a *per se* preemption rule and did not hold that all state classifications of immigrants are preempted by federal law.  To the contrary, the Supreme Court stated that it "has *never* held that every state enactment which in any way deals with aliens is a regulation of immigration and thus per se pre-empted by this constitutional power, whether latent or exercised."  *Id.* at 355 (emphasis added).

Plaintiffs cite *Plyler v. Doe*, 457 U.S. 202 (1982), in support of their *per se* preemption argument, but *Plyler* is not a preemption case.  It was decided on equal protection grounds and never considered whether the Texas law at issue (barring illegal alien children from attending public schools) was preempted by federal law.  Indeed, the majority opinion in *Plyler* does not even mention the word "preemption."  *Id.* at 205-230. *Plyler* does say that "States enjoy no power with respect to the classification of aliens" and that "[t]his power is committed to the political branches of the Federal Government," but these comments appear in the Court's equal protection analysis.  *Id.* at 225 (quotation

marks and citations omitted).  The Court cannot conclude that they were intended to establish a kind of *per se* preemption based on classification.

Plaintiffs cite *Toll v. Moreno*, 458 U.S. 1 (1982), for the same proposition, but *Toll* is not a *per se* preemption case.  *Toll* is a conflict preemption case.  The majority opinion never mentions *per se* preemption.  *Id.* at 3-19.  *Toll* held that a Maryland law which barred nonimmigrant aliens with G-4 visas from obtaining domicile and paying in-state tuition conflicted with actions of Congress which permitted the aliens to obtain domicile and other financial benefits.  *Id.* at 13-17.  The Court will address Plaintiffs' conflict preemption argument below.

Plaintiffs cite *Nyquist v. Mauclet*, 432 U.S. 1 (1977), but *Nyquist* is not a preemption case.  Like *Plyler*, it was decided on equal protection grounds.  *Id.* at 12.  The case never uses the word "preemption," much less "*per se* preemption."

For these reasons, the Court finds no support for Plaintiffs' *per se* preemption argument in the Supreme Court cases they cite.  Those cases do not adopt a specialized form of *per se* preemption for immigration cases as Plaintiffs suggest.  Nor does the Court find Plaintiffs' citation to several district court cases helpful.

The district court in *League of United Latin American Citizens v. Wilson*, 908 F. Supp. 755 (C.D. Cal. 1995), invalidated several provisions of a California initiative that required state officials and others to determine whether persons were in the United States legally, report them to federal authorities if they were not, and advise the individuals of their obligation to leave the Country, *id.* at 763-64.  *Wilson* based its holding on *De Canas*, which it read as holding, as a first of three tests, that any state law which regulated immigration is preempted.  *Id.* at 768.  *Wilson* went on to hold that any state law that required state officials to classify aliens in a manner independent of federal law constitutes a regulation of immigration and is preempted under this "first test."  *Id.* at 770.  The Court does not agree with *Wilson*'s reading of *De Canas*.  The first holding in *De Canas* was that the Constitution does *not* create a federal-only field of immigration which the States can never invade.  424 U.S. at 355.  The Court did not adopt the rule

applied by *Wilson* – that any state law which regulates immigration by classifying aliens is preempted.  For the same reason, the Court is not persuaded by the other district court cases cited by Plaintiffs, each of which adopts the incorrect *Wilson* reading of *De Canas*. *See Equal Access Educ. v. Merten*, 305 F. Supp. 2d 585 (E.D. Va. 2004); *Villas at Parkside Partners v. City of Farmers Branch*, 577 F. Supp. 2d 858 (N.D. Tex. 2008); *Hispanic Interest Coal. of Ala. v. Bentley*, No. 5:11-CV-2482-SLB, 2011 WL 5516953 (N.D. Ala. Sept. 28, 2011).

The Supreme Court's recent decision in *Arizona v. United States*, 132 S. Ct. 2492 (2012), supports the Court's understanding of preemption law.  In addressing the constitutionality of Arizona's S.B. 1070, a law that sought to encourage and enhance state enforcement of immigration laws, the Supreme Court never mentioned *per se* preemption or the "classification" analysis that *Wilson* claims to have found in *De Canas*.  Instead, the Supreme Court addressed the three traditional categories of preemption – express, field, and conflict (*id.* at 2500-01) – and held that one Arizona provision was invalid under field preemption and two were invalid under conflict preemption.  *Id.* at 2501-07.

In summary, the Court finds Plaintiffs' *per se* preemption argument to be legally incorrect.  The argument finds no support in relevant Supreme Court cases, appears to be inconsistent with traditional preemption analysis, and relies on district court cases the Court finds unpersuasive.[5]

**B.    Conflict Preemption.**

Plaintiffs initially appeared to argue that Arizona's policy was preempted because it conflicted with Secretary Napolitano's discretionary decision to grant deferred status to those who qualify under the DACA program.  Plaintiffs identified several ways in which the Arizona policy conflicted with the purposes of the DACA program, arguing that the policy "impermissibly undermines the federal goal of permitting [DACA recipients] to remain and work in the United States, and to be full, contributing members of society."

---

[5] Plaintiffs' *per se* preemption argument at times sounds close to field preemption, but Plaintiffs state that they are not making a field preemption argument (Doc. 91 at 17 n. 6), a fact confirmed by Plaintiffs' counsel at oral argument (Doc. 111 at 19:6-20:18).

Doc. 30 at 23.   In response to this argument, Defendants argued that Secretary Napolitano's memorandum could have no preemptive effect.  Defendants are correct.

The memorandum does not have the force of law.  Although the Supreme Court has recognized that federal agency regulations "with the force of law" can preempt conflicting state requirements, *Wyeth*, 555 U.S. at 576, federal regulations have the force of law only when they prescribe substantive rules and are promulgated through congressionally-mandated procedures such as notice-and-comment rulemaking.  *See River Runners for Wilderness v. Martin*, 593 F.3d 1064, 1071 (9th Cir. 2010) (citing *United States v. Fifty-Three (53) Eclectus Parrots*, 685 F.2d 1131, 1136 (9th Cir. 1982)). Secretary Napolitano's memorandum does not purport to establish substantive rules (in fact, it says that it does not create substantive rights) and it was not promulgated through any formal procedure.  As a result, the memorandum does not have the force of law and cannot preempt state law or policy.

Perhaps as a result of this reality, Plaintiffs clarified their conflict preemption argument in their reply memorandum, asserting that the Arizona policy "conflicts with *Congress's* decision to grant discretion to the Executive Branch to enforce the immigration laws[.]"  Doc. 99 at 15 (emphasis in original).  Unfortunately for Plaintiffs, this preemption argument also fails.  Conflict preemption exists when a state law or policy "stands as an obstacle to the accomplishment and execution of the full purposes and objectives of Congress."  *Arizona*, 132 S. Ct. at 2501.  The "purpose of Congress is the ultimate touchstone[.]"  *Medtronic, Inc. v. Lohr*, 518 U.S. 470, 485 (1996) (quotation marks and citations omitted).  Plaintiffs have identified no purpose of Congress with which the Arizona driver's license policy conflicts.

Plaintiffs characterize Defendants' driver's license policy as an attempt to decide "that DACA recipients are *not* authorized to be present" in the United States, an attempt that "undermines Congress' intent that the federal government alone have discretion to make these decisions."  Doc. 99 at 16 (emphasis in original).  The Court does not agree, however, that the Arizona policy constitutes an attempt to decide which aliens may

1  remain in the United States.  The policy concerns driver's licenses.  Unlike the Arizona
2  policy that was found to be conflict-preempted in *Arizona*, the driver's license policy
3  does not concern the arrest, prosecution, or removal of aliens from the State or the
4  Nation.  The Court cannot find that issuance or denial of driver's licenses "stands as an
5  obstacle to the accomplishment and execution of the full purposes and objectives of
6  Congress" in delegating immigration authority to DHS.  *See Hines*, 312 U.S. at  67.

7  　　　　Plaintiffs argue that Defendants' driver's license policy undermines Congress's
8  intent that the federal government decide who can work in the United States.  Plaintiffs'
9  submit that Defendants' policy stands as an obstacle to this federal objective because
10  driving is frequently necessary to work.  But Plaintiffs cite no authority to show that work
11  was one of the objectives Congress had in mind when it delegated immigration authority
12  to DHS.  And to the extent Plaintiffs rely on the purposes of the DACA program, they are
13  looking to a nonbinding policy of a federal agency, not the intent of Congress which is
14  the touchstone of conflict preemption analysis.  What is more, the Court certainly cannot
15  impute the intentions of the DACA program to Congress when Congress itself has
16  declined repeatedly to enact legislation that would accomplish the goals of the DACA
17  program.  *See, e.g.*, DREAM Act of 2011, S. 952, H.R. 1842, 112th Cong. (2011).

18  　　　　In short, Defendants have identified no congressional intent that is frustrated by
19  Arizona's driver's license policy.   They certainly have not identified the kinds of
20  conflicts that have led the Supreme Court to find conflict preemption in cases such as
21  *Arizona*, 132 S. Ct. at 2503-07, and *Toll*, 458 U.S. at 12-15.   As a result, the Court
22  concludes that Plaintiffs cannot succeed on the merits of their Supremacy Clause claim.

23  **III.    Likelihood of Success on the Equal Protection Claim (Count Two).**

24  　　　　**A.    Plaintiffs Are Similarly Situated.**

25  　　　　To prevail on their equal protection claim, Plaintiffs "must make a showing that a
26  class that is similarly situated has been treated disparately."  *Christian Gospel Church,*
27  *Inc. v. City and Cnty. of S.F.*, 896 F.2d 1221, 1225-26 (9th Cir. 1990).  "The first step in
28  equal protection analysis is to identify the state's classification of groups."  *Country*

1    *Classic Dairies, Inc. v. State of Mont., Dep't of Commerce Milk Control Bureau*,

2    847 F.2d 593, 596 (9th Cir. 1988).  "The groups must be comprised of similarly situated

3    persons so that the factor motivating the alleged discrimination can be identified."

4    *Thornton v. City of St. Helens*, 425 F.3d 1158, 1167 (9th Cir. 2012).

5        Plaintiffs argue that DACA recipients are similarly situated to other noncitizens

6    holding EADs who are eligible to obtain driver's licenses in Arizona.  Defendants argue

7    that DACA recipients are not similarly situated to other EAD holders, including other

8    deferred action recipients, because these other noncitizens are classified differently under

9    federal immigration law.  Defendants point to USCIS's creation of a new EAD category

10   code for DACA recipients.  USCIS's form I-765 instructs DACA recipients to enter

11   "(c)(33)," whereas other forms of deferred action are categorized under "(c)(14)."

12   Defendants also note that the Department of Health and Human Services ("DHHS") has

13   determined that DACA recipients are not "lawfully present" for purposes of health care

14   benefits conferred on other deferred action recipients, 45 C.F.R. § 152.2(8), and argue

15   that this determination shows that even the federal government distinguishes the DACA

16   program from other forms of deferred action.

17       Plaintiffs argue that these distinctions are not relevant to the issue of whether

18   DACA recipients are similarly situated for purposes of Defendants' driver's license

19   policy.  The Court is inclined to agree with Plaintiffs.  The question is not whether

20   DACA recipients are identical in every respect to other deferred action recipients, but

21   whether they are the same in respects relevant to the driver's license policy.  *See*

22   *Nordlinger v. Hahn*, 505 U.S. 1, 10 (1992) ("The Equal Protection Clause does not forbid

23   classifications.  It simply keeps governmental decisionmakers from treating differently

24   persons who are in all relevant respects alike.").  Defendants have identified nothing

25   about the (c)(33) category code to suggest that DACA recipients are somehow less

26   authorized to be present in the United States than are other deferred action recipients.

27   Nor have Defendants shown that the DHHS policy is based on DACA recipients being

28   less authorized.  All deferred action recipients are permitted to remain in the country

without removal for a temporary period of time, and the EADs held by those recipients appear to be valid only for a temporary period.  *See* 8 C.F.R. § 274a.12(c)(14) ("USCIS . . . may establish a specific validity period for an [EAD]" for "[a]n alien who has been granted deferred action").  Moreover, Defendants issued driver's licenses to all applicants submitting an EAD as proof of "authorized presence" before the DACA program was implemented.  Doc. 60-1 at 12-15, ¶¶ 25-26.

Defendants argue that DACA recipients are different because other forms of deferred action arise "incident to some type of statutory relief or in anticipation of a pending regulatory or statutory change."  Doc. 85 at 21; *see also* Doc. 108 at 2.  Plaintiffs vigorously dispute that deferred action recipients other than DACA grantees are on a path to formal immigration status, noting that deferred action often is granted to persons in active immigration removal proceedings or to other persons with no hope of a formal legal immigration status such as witnesses paroled into the United States pending completion of a criminal trial, after which they will be removed.  Defendants have not provided an effective response to these arguments.  *See* Doc. 86-2 at 71.

Defendants prepared a chart to show that "the vast majority of driver's licenses issued to EAD holders were issued to aliens who had actual or pending lawful immigration status and who are not remotely similarly situated to Plaintiffs."  Doc. 85 at 23-24.  But the chart, based on a statistical sample, shows that ten of the persons sampled held a (c)(14) category code, had no formal immigration status or a pathway to obtain formal status, did not have a classification or status authorized by statute or regulation, and yet received driver's licenses from the State.  Doc. 83-6 at 7.  Defendants argue that these ten licenses constitute only 1.3% of the licenses issued to persons in the statistical sample, apparently suggesting that this relatively small percentage means Plaintiffs have not been treated differently.  Plaintiffs dispute the chart, arguing that many deferred action recipients listed in other columns of the chart also lack formal immigration status or any meaningful hope of such status.  But even if Defendants' chart is accepted as correct, 1.3% of licenses issued to EAD holders over the last seven years is not an

1   insignificant number.  It equates to more than 600 deferred action recipients who have

2   been granted driver's licenses on the basis of EADs.[6]

3         Plaintiffs also argue that they are similarly situated to persons issued licenses on

4   the basis of an EAD with (c)(9) and (c)(10) category codes.  The (c)(9) code is for

5   applicants for adjustment of status, the (c)(10) for applicants for suspension of

6   deportation and cancellation of removal.  8 C.F.R. §§ 274a.12(c)(9), (c)(10).  Many of

7   these individuals have no formal immigration status and little hope of one, and yet they

8   amount to 66.4% of the people granted licenses during the last seven years on the basis of

9   EADs.  Doc. 85 at 24.

10        Given the fact that (c)(9) and (c)(10) codes do not necessarily reflect individuals

11  with any significant likelihood of receiving formal immigration status, and the fact that

12  more than 600 similarly situated people appear to have received driver's licenses during

13  the last seven years, the Court concludes that Plaintiffs are likely to succeed in

14  establishing that DACA recipients are similarly situated to persons who have obtained a

15  driver's license in the past using EADs.

16        **B.     Level of Scrutiny.**

17        The Court must next determine the level of scrutiny to be applied under the equal

18  protection analysis.  *Freeman v. City of Santa Ana*, 68 F.3d 1180, 1187 (9th Cir. 1995)

19  (quotation marks and citations omitted).  Plaintiffs argue that (1) Defendants' driver's

20  license policy is based on alienage and subject to strict scrutiny; (2) if not, the policy is

21  subject to heightened scrutiny; and (3) if not, Defendants' policy cannot survive even

22  rational basis review.  Defendants' argue for rational basis scrutiny.

23        **1.     Strict Scrutiny.**

24        The Supreme Court has stated that "classifications based on alienage . . . are

25  inherently suspect and subject to close judicial scrutiny."  *Graham v. Richardson*, 403

26  U.S. 365, 372 (1971) ("Aliens as a class are a prime example of a 'discrete and insular'

27  minority for whom such heightened judicial solicitude is appropriate." (citation omitted)).

28
_____

          [6] 1.3% of 47,500 equals 618.

1    *Graham* struck down Arizona and Pennsylvania laws that denied public assistance to

2    legal resident aliens or to resident aliens who did not meet a durational residency

3    requirement.  *Id.* at 367-68, 379-80.  The states sought to favor citizens and long-term

4    residents in their expenditure of limited resources, but the Court found the classifications

5    to be "inherently suspect," explaining that the states' cost-savings justification "is

6    particularly inappropriate and unreasonable when the discriminated class consists of

7    aliens."  *Id.* at 376.   Underlying the Court's holding was its focus on the similarities

8    between legal resident aliens and citizens:  "Aliens like citizens pay taxes and may be

9    called into the armed forces. . . . [A]liens may live within a state for many years, work in

10   the state and contribute to the economic growth of the state."  *Id.* (quotation marks and

11   citations omitted).

12       Two years later, the Supreme Court reaffirmed its holding that aliens are a suspect

13   class when it struck down a Connecticut rule that denied bar admission to legal resident

14   aliens.  *In re Griffiths*, 413 U.S. 717, 718-19, 729 (1973).  *Griffiths* also noted that

15   "[r]esident aliens, like citizens, pay taxes, support the economy, serve in the Armed

16   Forces, and contribute in myriad other ways to our society."  *Id.* at 722.  The Court found

17   that limiting the practice of law to citizens did not serve the state's interest in "assur[ing]

18   the requisite qualifications of persons licensed to practice law," and that the "wholesale

19   ban" was not justified on "the possibility that some resident aliens are unsuited to the

20   practice of law[.]"  *Id.* at 722-25.

21       In *Nyquist v. Mauclet*, 432 U.S. 1 (1977), legal resident aliens challenged a New

22   York law that conditioned eligibility for postsecondary education financial assistance on

23   residency and citizenship.  *Id.* at 2-6.  The citizenship requirement was satisfied if the

24   applicant was a citizen, had applied to become a citizen, or, if not qualified to apply for

25   citizenship, submitted a statement affirming intent to apply for citizenship as soon as the

26   applicant was qualified.  *Id.* at 3-4.  In finding that the law impermissibly discriminated

27   on the basis of alienage, the Supreme Court again described the similarities between

28   citizens and lawful resident aliens:  "Resident aliens are obligated to pay their full share

of the taxes that support the assistance programs. . . . And although an alien may be barred from full involvement in the political arena, he may play a role perhaps even a leadership role in other areas of import to the community." *Id.* at 12.

The Supreme Court reached a different conclusion with respect to undocumented aliens. In *Plyler v. Doe*, 457 U.S. 202 (1982), the Court held that "[u]ndocumented aliens cannot be treated as a suspect class because their presence in this country in violation of federal law is not a 'constitutional irrelevancy.'" *Id.* at 223. *Plyler* considered the constitutionality of a Texas law that denied undocumented alien children a free public school education. *Id.* at 205. The Court explained that "undocumented status is not irrelevant to any proper legislative goal. Nor is undocumented status an absolutely immutable characteristic since it is the product of conscious, indeed unlawful action." *Id.* at 220.

In summary, the Supreme Court has applied strict scrutiny to classifications affecting lawful resident aliens, but not to classifications affecting undocumented aliens. This case falls somewhere between those two groups. Plaintiffs are undocumented aliens who have been granted deferred status for a period of two years. Their status is not the result of a statute or federal regulation, but stems solely from an exercise of prosecutorial discretion. Unlike the aliens in *Graham*, *Griffiths*, and *Nyquist*, Plaintiffs have not historically been lawfully employed, and in general they have not paid income taxes or served in the military.[7] Even DHHS classifies DACA recipients as not "lawfully present"

---

[7] The Court acknowledges that some undocumented aliens pay income taxes, and some serve in the military. *See* Travis Loller, *Many Illegal Immigrants Pay Up at Tax Time*, USA TODAY, Apr. 11, 2008, http://usatoday30.usatoday.com/money/perfi/taxes/2008-04-10-immigranttaxes_N.htm; *see also* President Barack Obama, Remarks by the President on Immigration (June 15, 2012), *available at* http://www.whitehouse.gov/the-press-office/2012/06/15/remarks-president-immigration ("I've got a young person who is serving in our military, protecting us and our freedom. The notion that in some ways we would treat them as expendable makes no sense); Tracey Jan, *Shift Leads to Confusion on Status Within Military*, BOSTON GLOBE, June 23, 2012, http://www.bostonglobe.com/ews/politics/2012/06/22/president-obama-mitt-romney-aim-help-illegal-servicemembers-who-shouldn-uniform/FAW5x8g0wvB1gaHNAjiXbO/story.html (regarding the DACA eligibility criteria for honorably discharged veterans of the Coast Guard or Armed Forces of the United States, "'Unless the current law were to be changed, or an individual were declared by the services to be vital to the national interest, the services are not permitted to enlist illegal immigrants,' said a Department of Defense spokesperson, who did not

for purposes of certain benefits.  Plaintiffs in some respects are like the undocumented aliens in *Plyler*, whom the Court described as enjoying an "inchoate federal permission to remain," 457 U.S. at 226, but there are material distinctions from the *Plyler* undocumented aliens as well.  As a result of the DACA program, Plaintiffs may receive EADs and Social Security numbers, work lawfully, and pay income taxes.  In an effort to decide what level of scrutiny to afford Plaintiffs, the Court finds helpful guidance in several court of appeals decisions.

In *LeClerc v. Webb*, 419 F.3d 405 (5th Cir. 2005), the Fifth Circuit applied rational basis scrutiny to a Louisiana rule that prohibited aliens temporarily admitted to the United States (referred to in the opinion as "nonimmigrant aliens") from sitting for the state's bar examination – only citizens or permanent resident aliens could become lawyers.  The court started with the premise that "the Supreme Court has reviewed with strict scrutiny only state laws affecting permanent resident aliens." *Id.* at 415.  In cases concerning illegal aliens, the children of illegal aliens, or nonimmigrant aliens, *LeClerc* noted that the Supreme Court "has either foregone Equal Protection analysis, *see Toll v. Moreno*, 458 U.S. 1 (1982) (nonimmigrant G-4 aliens); *De Canas v. Bica*, 424 U.S. 351 (1976) (illegal aliens), or has applied a modified rational basis review, *see Plyler v. Doe*, 457 U.S. 202 (1982) (children of illegal aliens)." *Id.* at 416.  *LeClerc* thus read the Supreme Court's precedent as requiring strict scrutiny only when the state law alienage classification "t[akes a] position seemingly inconsistent with the congressional determination to admit the alien to *permanent residence.*"  *Id.* at 417 (emphasis in original) (quoting *Foley v. Connelie*, 435 U.S. 291, 295 (1978)).

*LeClerc* noted that unlike "resident aliens [who] are similarity situated to citizens in their economic, social, and civic (as opposed to political) conditions[,]" "[n]onimmigrant aliens' status is far more constricted[.]"  *Id.* at 418.  "Based on the aggregate factual and legal distinctions between resident aliens and nonimmigrant

---

know why Obama had included military service as a condition.  An official with the Department of Homeland Security acknowledged that 'few, if any, individuals fall into this category' that Obama referred to last week.").

aliens," *LeClerc* explained, "we conclude that although aliens are a suspect class in general, they are not homogeneous and precedent does not support the proposition that nonimmigrant aliens are a suspect class entitled to have state legislative classifications concerning them subjected to strict scrutiny." *Id.* at 419. "By process of elimination, rational basis review must be the appropriate standard for evaluating state law classifications affecting nonimmigrant aliens." *Id.* at 420.

*LeClerc* was followed in *League of United Latin American Citizens (LULAC) v. Bredesen*, 500 F.3d 523 (6th Cir. 2007). *LULAC* concerned a Tennessee law that conditioned issuance of a driver's license on proof of citizenship or lawful permanent resident status. *Id.* at 526. Plaintiffs were lawful temporary aliens, not lawful permanent aliens. Plaintiffs cited *Nyquist* in support of their argument that strict scrutiny applied to any classification affecting lawful aliens. *Id.* at 531. The Sixth Circuit distinguished *Nyquist* because the plaintiffs there were lawful permanent resident aliens. *Id.* at 532-33. Adopting *LeClerc*'s lengthy discussion about "why lawful temporary resident aliens, or 'nonimmigrant aliens,' are not entitled to the same protection as lawful permanent resident aliens," *LULAC* concluded that "[b]ecause the instant classification does not result in discriminatory harm to members of a suspect class, it is subject only to rational basis scrutiny." *Id.* at 533.

The Second Circuit reached the opposite conclusion in *Dandamudi v. Tisch*, 686 F.3d 66 (2d Cir. 2012), which involved a challenge to a New York law that limited pharmacist licenses to citizens and lawful permanent resident aliens. *Id.* at 69. The plaintiffs were nonimmigrant aliens holding two kinds of temporary worker visas. The court applied strict scrutiny because "a state statute that discriminates against aliens who have been lawfully admitted to reside and work in the United States should be viewed in the same light under the Equal Protection Clause as one which discriminates against aliens who enjoy the right to reside here permanently." *Id.* at 70. The court reviewed the Supreme Court cases discussed above and concluded that "the Supreme Court recognizes aliens generally as a discrete and insular minority[.]" *Id.* at 75. The court refused to

construct an exception to the *Graham* rule based on the "transience" of nonimmigrant aliens as compared to lawful permanent resident aliens. *Id.* at 78-79. The court also noted that "federal law permits many aliens with [these two kinds of temporary worker visas] to maintain their temporary worker authorization for a period greater than six years. All plaintiffs in this case, for example, have been *legally authorized* to reside and work in the United States for more than six years." *Id.* at 71 (emphasis in original). The court further observed that "[a] great number of these professionals remain in the United States for much longer than six years and many ultimately apply for, and obtain, permanent residence. These practicalities are not irrelevant. They demonstrate that there is little or no distinction between [lawful permanent resident aliens] and the lawfully admitted nonimmigrant plaintiffs here." *Id.* at 78. Accordingly, the court distinguished *LeClerc* and *LULAC* on the ground that "[t]he aliens at issue here are 'transient' in name only." *Id.*

The Court finds the reasoning in *LeClerc* and *LULAC* persuasive. *Plyler* makes clear that strict scrutiny does not apply to all classes of aliens, and the decisions of the Fifth and Sixth Circuits reasonably conclude that the rationale of *Graham*, *Griffiths*, and *Nyquist* applies to lawful resident aliens who are like citizens in most material respects. *Dandamudi* also concerned aliens who were factually similar to lawful permanent residents. Plaintiffs selectively quote from *Dandamudi* and argue that the decision supports the application of strict scrutiny to classifications directed at persons "who have been granted the legal right to reside and work in the United States," 686 F.3d at 72, but the *Dandamudi* plaintiffs each had an official visa, not merely a temporary grant of deferred action. *Dandamudi* does not support Plaintiffs' claim for strict scrutiny. DACA recipients are more like the undocumented aliens in *Plyler* and the temporary aliens in *LULAC* and *LeClerc* than the visa holders in *Dandamudi* or the permanent residents in *Graham*, *Griffiths*, and *Nyquist*. Accordingly, Plaintiffs have not established that Defendants' policy is subject to strict scrutiny.

1          **2.      Intermediate Scrutiny.**

2          Plaintiffs alternatively argue that DACA recipients constitute a quasi-suspect class

3  warranting heightened scrutiny.  Plaintiffs rely on *High Tech Gays v. Defense Industrial*

4  *Security Clearance Office*, 895 F.2d 563 (9th Cir. 1990), which held that heightened

5  scrutiny applies to plaintiffs who (1) have suffered a history of discrimination; (2) exhibit

6  obvious, immutable, or distinguishing characteristics that define them as a discrete group;

7  and (3) show that they are a minority or politically powerless.  *Id.* at 573.  The Court

8  cannot conclude that Plaintiffs are likely to qualify for heightened scrutiny under this test.

9          Plaintiffs contend that they constitute a discrete group with obvious, immutable, or

10 distinguishing characteristics because they have been provided EADs with the unique

11 (c)(33) category code.  But the Court is not persuaded that this category code constitutes

12 the same kind of distinguishing characteristic as gender or illegitimacy.  *See Lockhart v.*

13 *McCree*, 476 U.S. 162, 175 (1986) (noting that "race, gender, or ethnic background" are

14 examples of immutable characteristics).  And the Supreme Court in *Plyler* held that the

15 plaintiffs' undocumented status is not "an absolutely immutable characteristic since it is

16 the product of conscious, indeed unlawful, action."  457 U.S. at 220.  In addition, because

17 individuals identified by the (c)(33) category code have been in existence only since the

18 recent start of the DACA program, Plaintiffs likely cannot show that such individuals

19 have suffered a history of discrimination.

20         Plaintiffs argue that they are politically powerless because they have been granted

21 federal authorization to live and work in the United States, but still cannot vote.

22 Accepting this argument would ignore the political realities of the national immigration

23 scheme and the fact that the law, not discrimination, denies them the right to vote.  *See*

24 *Foley*, 435 U.S. at 295 ("It would be inappropriate, however, to require every statutory

25 exclusion of aliens to clear the high hurdle of strict scrutiny, because to do so would

26 'obliterate all the distinctions between citizens and aliens, and thus depreciate the historic

27 values of citizenship.'" (quoting *Nyquist*, 432 U.S. at 14 (Burger, C.J., dissenting))).  Nor

28 can the Court conclude that persons unable to vote are necessarily politically powerless.

In *City of Cleburne v. Cleburne Living Center, Inc.*, 473 U.S. 432 (1985), the Supreme Court held that the mentally disabled, including the severely disabled, were not politically powerless because they had the ability to "attract the attention of the lawmakers."  *Id.* at 445; *see also High Tech Gays*, 895 F.2d at 574.  The DACA program itself attests to the fact that Plaintiffs have attracted the attention of policymakers in the federal government.

Plaintiffs also cite *Plyler* as an intermediate scrutiny case and argue that the Court should apply its rationale.  *Plyler*, however, is an anomaly.  It does not apply intermediate scrutiny.  *See* 457 U.S. at 217-18 n. 16 (discussing but not applying intermediate scrutiny review).  *Plyler* appears to apply a hybrid form of review, stating that the Texas law in question "can hardly be considered *rational* unless it furthers some *substantial* goal of the State."  *Id.* at 224 (emphasis added).  However one characterizes this unusual standard, the Court cannot agree that it applies here.  *Plyler* emphasized two facts as justifying its higher level of review:  (1) the age of the undocumented children (*id*. at 223 ("[the law] imposes a lifetime hardship on a discrete class of children not accountable for their disabling status")), and (2) the importance of education to those children and the entire nation (*id*. at 221 ("education has a fundamental role in maintaining the fabric of our society")).  Unlike the class of undocumented children in *Plyler*, DACA recipients, and specifically Plaintiffs in this putative class action, are older – between 18 and 26.  Doc. 1, ¶¶ 19-23. Because of their age, Plaintiffs are not like the young children in *Plyler* whose compliance with the law was entirely dependent on the conduct of parents who decided to enter the United States illegally and remain here in violation of the law.  And unlike education, a driver's license does not provide "the basic tools by which individuals might lead economically productive lives to the benefit of us all."  *Id*. at 221.  Plaintiffs have not argued – nor could they – that a driver's license has the same significance to an individual or society as a primary school education.

The Court concludes that Plaintiffs have not shown that they are likely to qualify for heightened scrutiny.

3.      **Rational Basis Scrutiny.**

"Under traditional rational basis analysis, a state law classification that 'neither burdens a fundamental right nor targets a suspect class' will be upheld 'so long as it bears a rational relation to *some* legitimate end.'"  *LeClerc*, 419 F.3d at 421 (emphasis in original) (quoting *Vacco v. Quill*, 521 U.S. 793, 799 (1997).  But "even the standard of rationality . . . must find some footing in the realities of the subject addressed by the legislation." *Heller v. Doe*, 509 U.S. 312, 321 (1993).

Cases have varied in their application of the rational basis test.  Many apply the test in a highly deferential manner, upholding the challenged law "if there is any reasonably conceivable state of facts that could provide a rational basis for the classification.'"  *Id.* at 320 (quoting *F.C.C. v. Beach Commc'ns, Inc.*, 508 U.S. 307, 313 (1993)).  This approach reflects "deference to legislative policy decisions" and a reluctance of courts "to judge the wisdom, fairness, logic or desirability of those choices." *LeClerc*, 419 F.3d at 421.

Other cases have applied a more rigorous form of rational basis scrutiny.  This analysis looks, at least initially, to the actual reasons for the challenged classification and asks whether they are rationally related to a legitimate governmental objective.  Examples of this more active review include Supreme Court cases such as *U.S. Department of Agriculture v. Moreno*, 413 U.S. 528 (1973), *City of Cleburne v. Cleburne Living Center, Inc.*, 473 U.S. 432 (1985), and *Romer v. Evans*, 517 U.S. 620 (1996).  These cases have applied the rational basis test in a more rigorous manner than the highly deferential cases, and yet have done so without announcing a new level of review, without acknowledging that they were departing from traditional rational basis analysis, and without identifying the principles to be used in determining whether a more active or a more deferential version of the rational basis test should be applied.

In *Moreno*, the Supreme Court applied rational basis review to an amendment of the Food Stamp Act of 1964 that denied benefits to any household whose members were not all related to each other.  The Supreme Court found that "[t]he challenged statutory

classification (households of related persons versus households containing one or more unrelated persons) is clearly irrelevant to the stated purposes of the Act." 413 U.S. at 534. The Court examined the amendment's legislative history to determine whether the challenged classification rationally furthered some other legitimate governmental interest. *Id.* The Court concluded that the legislative history "indicate[d] that that amendment was intended to prevent socalled 'hippies' and 'hippie communes' from participating in the food stamp program," and found that "[t]he challenged classification clearly cannot be sustained by reference to this congressional purpose." *Id.* "For if the constitutional conception of 'equal protection of the laws' means anything, it must at the very least mean that a bare congressional desire to harm a politically unpopular group cannot constitute a legitimate governmental interest." *Id.* at 534. The Court considered the Government's argument that the amendment was rationally related to the legitimate interest "in minimizing fraud in the administration of the food stamp program," but determined that the existence of other provisions within the Act that were intended to prevent those same abuses "casts considerable doubt upon the proposition that the . . . amendment could rationally have been intended to prevent those very same abuses." *Id.* at 535-37. The Court concluded by noting that "[t]raditional equal protection analysis does not require that every classification be drawn with precise 'mathematical nicety.' But the classification here in issue is not only 'imprecise', it is wholly without any rational basis." *Id.* at 538.

In *Cleburne*, the Supreme Court used rational basis review to invalidate a zoning ordinance that required a special permit for the operation of a home for the mentally disabled. The Court noted that under rational basis review "[t]he State may not rely on a classification whose relationship to an asserted goal is so attenuated as to render the distinction arbitrary or irrational." 473 U.S. at 446. The Court considered whether the city had a legitimate interest in requiring a permit for the home while freely permitting other care and multiple-dwelling facilities. *Id.* at 447-48. The Court found that any difference between a group home for the mentally disabled and other multiple-dwelling

facilities was not legitimate because the mentally disabled group home did not "pose any special threat to the city's legitimate interests[.]"  *Id.* at 448.  The city argued that the special permit requirement was necessary because of the negative attitude of homeowners located near the proposed facility, but the Supreme Court held that "[p]rivate biases may be outside the reach of the law, but the law cannot, directly or indirectly, give them effect."  *Id.* at 448 (quoting *Palmore v. Sidoti*, 466 U.S. 429, 433 (1984)).  The city also argued that nearby junior high school students might harass the facility's occupants, but the Court found this concern based on "undifferentiated fears."  *Id.* at 449.  The Court dismissed several other proffered grounds for the permit requirement, finding that none of them bore a rational relationship to a legitimate governmental interest.  *Id.* at 449-50. The Court concluded "that requiring the permit in this case appears to us to rest on an irrational prejudice against the mentally retarded[.]"  *Id.* at 450.

In *Romer*, the Supreme Court found that a Colorado voter initiative that repealed laws prohibiting discrimination based on sexual orientation failed rational basis review. The Court noted "that laws of the kind now before us raise the inevitable inference that the disadvantage imposed is born of animosity toward the class of persons affected."  517 U.S. at 634.  The Court found that "[t]he breadth of the amendment is so far removed from these particular justifications that we find it impossible to credit them.  We cannot say that [the initiative] is directed to any identifiable purpose or discrete objective.  It is a status-based enactment divorced from any factual context from which we could discern a relationship to legitimate state interests; it is a classification of persons undertaken for its own sake, something the Equal Protection Clause does not permit."  *Id.* at 635.

A recent example of more rigorous rational basis review is *Diaz v. Brewer*, 656 F.3d 1008 (9th Cir. 2011).  *Diaz* affirmed a district court's order that preliminarily enjoined Arizona from terminating the healthcare benefits of state employees' same-sex partners.  *Id*. at 1010.  The Ninth Circuit found the district court's order "consistent with long standing equal protection jurisprudence holding that 'some objectives, such as a bare . . . desire to harm a politically unpopular group, are not legitimate interests.'"  *Id.* at

1015 (quoting *Lawrence v. Texas*, 539 U.S. 558, 580 (2003) (O'Connor, J., concurring)). The Ninth Circuit found that "the district court properly rejected the state's claimed legislative justification because the record established that the statute was not rationally related to furthering such interests." *Id.* at 1015.

In each of these cases, courts appear to have identified what they understood to be the actual reason for the classification, to have found that reason impermissible, and therefore to have found that the classification failed the rational basis test. Whether they reflect private biases, negative attitudes towards certain classes of persons, or some other perceived illegitimate basis, classifications arising from improper motives appear to draw a more active level of review. The Court finds this kind of rational basis review to be problematic. The rational basis test has long been viewed as reflecting the deference courts should afford to the policy-making branches of government. The Court also finds this more rigorous rational basis review, with its lack of guiding principles, to be dangerously susceptible to invoking a judge's own policy preferences. These concerns notwithstanding, the Supreme Court and Ninth Circuit plainly have applied a more active rational basis review in some cases, and those cases constitute precedent binding on this Court. When the Court considers what appears to be the actual reason for Arizona's driver's license policy, it concludes that the policy is likely to invoke, and fail, such rational basis scrutiny.

### C.    Application of Rational Basis Review.

On June 15, 2012, the day Secretary Napolitano announced the DACA program, Arizona Governor Brewer publicly denounced the program as "backdoor amnesty," "desperate political pandering by a president desperate to shore up his political base," and "pandering to a certain population." Doc. 38, ¶ 12. Although the evidence shows that ADOT thereafter undertook a review of its driver's license policy in light of the DACA program, that review had not reached a conclusion as of August 15, 2012, the day the federal government began accepting DACA applications and the day on which Governor Brewer issued her Executive Order. Director Halikowski testified that ADOT had not

1    changed its policy as of August 15th and was still "in the process of coming up with a

2    recommendation."  Doc. 86-4 at 97-98; *see also* Doc. 60-1 at 12-15, ¶¶ 21-24.

3          The Governor, however, had made her decision.  She issued the Executive Order

4    directing State agencies to deny DACA recipients "any taxpayer-funded public benefits

5    and state identification, including a driver's license[.]"  Doc. 1-1.  Governor Brewer

6    explained that the Executive Order was necessary to make clear there would be "no

7    drivers [sic] licenses for illegal people."  Doc. 38, ¶ 13.

8          Once the Executive Order had been issued, ADOT had no discretion to reach a

9    different conclusion.  The State's chief executive had spoken and had directed the State's

10   executive agencies, including ADOT, to ensure that no DACA recipients obtain driver's

11   licenses.  Doc. 1-1.  Eight days later, on August 23, 2012, ADOT managers met to

12   discuss the scope of the policy they should adopt – whether to deny driver's licenses to

13   DACA recipients alone, to all applicants who lack legal status in this country, or to all

14   applicants who lack legal status under an act of Congress.  Doc. 86-4 at 185-87; Doc. 99-

15   1 at 262-63.  Participants in the meeting noted that the second and third alternatives might

16   be "[m]ore defensible in court" (Doc. 99-1 at 263), but ultimately adopted the first – only

17   DACA recipients would be denied driver's licenses.  It appears that participants in this

18   meeting did not know that the EADs issued to DACA recipients would bear a different

19   code than those issued to other deferred action recipients.  Doc. 86-4 at 186.  Nor did they

20   know that DHHS would deny certain federal health benefits to DACA recipients, an

21   action that was not taken until several days later.  Doc. 58-1 at 105-107, 111-12.

22         ADOT's new policy became effective on September 17, 2012.  It provided that an

23   EAD presented by a DACA recipient "is not acceptable" documentation for a driver's

24   license.  Doc. 34-4 at 4.  ADOT continued, however, to accept EADs from others.

25         This record suggests that the State's policy was adopted at the direction of

26   Governor Brewer because she disagreed with the Obama Administration's DACA

27   program.  The Governor strongly criticized the program as "backdoor amnesty" and

28   political "pandering" (Doc. 38, ¶ 12), and her comments related to the Executive Order

show that she disagreed with the federal government's conclusion that DACA recipients are now authorized by federal law to be present in the country, referring to them as "illegal people." Doc. 38, ¶ 13.

The Court recognizes that a governor may legitimately disagree with the federal government on policy and political matters, and certainly has the right to voice those disagreements. But the Court cannot conclude that such views constitute a rational basis for treating similarly situated people differently with respect to driver's licenses. To satisfy the rational basis test, the basis must not only be rational, it must also be related to the government classification at issue – in this case, denial of driver's licenses to some deferred action recipients but not others. *See Moreno*, 413 U.S. at 533 (the "classification itself" must be "rationally related to a legitimate governmental interest"). The Governor's disagreement with the DACA program may be a rational political or policy view in the broad sense – reasonable people certainly can disagree on an issue as complex and difficult as immigration – but it provides no justification for saying that an Arizona driver's license may be issued to one person who has been permitted to remain temporarily in the country on deferred action status – say for an individual humanitarian reason – while another person who has been permitted to remain temporarily in the country on deferred action status under the DACA program is denied a license. Both individuals have been granted deferred action status through federal prosecutorial discretion, both have been granted that status temporarily, both are eligible to work while here, and both may be issued EADs.[8] The Governor's political disagreement with the DACA program as "backdoor amnesty" does not change the fact that both individuals have been allowed by the federal government to live and work here, nor does it identify a reason that one of the individuals presents less of a driver's-license-related risk to the State. Thus, although some might view the Governor's stated reasons for issuing the

---

[8] Work authorization and the issuance of an EAD is not automatic for DACA recipients or persons receiving other forms of deferred action. Both must apply separately for work authorization and are eligible only if they can establish "economic necessity for employment." 8 C.F.R. § 274a.12(c)(14); Doc. 90-3 at 31, 42.

1    Executive Order as rational, it is not related to the policy considerations that underlie the

2    issuance of driver's licenses and therefore does not satisfy the rational basis test.[9]

3          Defendants have suggested several other rational bases for their policy:

4    (1) DACA recipients may not have authorized presence under federal law, and ADOT

5    therefore could face liability for issuing up to 80,000 driver's licenses to illegal

6    immigrants or for not cancelling those licenses quickly enough if the DACA program is

7    subsequently determined to be unlawful; (2) issuing driver's licenses to DACA recipients

8    could allow those individuals to access federal and state benefits to which they are not

9    entitled; (3) the DACA program could be revoked at any time and ADOT would have to

10   then cancel the licenses that had already been issued to DACA recipients; and (4) if

11   DACA was revoked or if DHS commenced removal proceedings against any DACA

12   recipient, as it could at any time, then the DACA recipient would be subject to immediate

13   deportation or removal and that individual could escape financial responsibility for

14   property damage or personal injury caused in automobile accidents. Doc. 60-1 at 12-15,

15   ¶¶ 8-20. The Court is not persuaded that any of these suggested justifications would

16   survive active rational basis review.

17         As their first justification, Defendants argue that they had uncertainty about

18   whether DACA recipients have an authorized presence in the United States under federal

19   law and were concerned they might face liability if they issued licenses to unauthorized

20   persons. But DACA recipients are issued EADs by the federal government, and

21   Defendants previously and routinely accepted all EADs as sufficient evidence of

22   authorized presence. Doc. 60-1 at 12-15, ¶¶ 25-26. Defendants did not previously

23   inquire into the meaning of EAD categorization codes or whether a particular kind of

24   EAD holder had lawful status or a pathway to lawful status. *See generally* Doc. 60-1 at

25

26         [9] Plaintiffs argue that the Governor's statements also evince hostility to DACA
     recipients and other illegal aliens. The Court need not, and does not, go so far as to
27   ascribe such an intent to the Governor. The Governor's strong disagreement with the
     DACA program was clearly stated and provides a sufficient basis for concluding that an
28   active form of rational basis review is likely in this case, and that the Arizona policy
     probably will not survive such review.

1   12-15, ¶¶ 25-26; Doc. 83-5, ¶¶ 2-6.  This policy changed on September 17, 2012, but

2   only with respect to DACA recipients – they alone were denied driver's licenses on the

3   basis of EADs.  This fact strongly suggests that the sufficiency of EADs to prove lawful

4   presence was not the reason for the State's action.[10]

5       Moreover, when asked in their depositions about the risk of state liability for

6   issuing driver's licenses, ADOT Director Halikowski and Assistant Director Stanton

7   could not identify instances where ADOT faced liability for issuing licenses to

8   individuals who lacked authorized presence.  Doc. 99 at 25.  Halikowski provided only

9   one example of potential state liability – when ADOT had improperly issued a driver's

10  license to a person convicted of driving under the influence of alcohol (Doc. 86-4 at

11  113:18–115:20), an instance quite unrelated to the prospect of issuing a license to a

12  person presenting a federally-issued EAD as proof of lawful presence under federal law.

13  Stanton could not provide any examples.  Doc. 86-4 at 25:16–26:2.

14      In describing this justification and others, Defendants note that they were facing as

15  many as 80,000 driver's license requests from DACA recipients, but this concern has not

16  been borne out by the numbers.  Between 2005 and 2012, MVD issued approximately

17  47,500 driver's licenses on the basis of EADs.  Doc. 34-7 at 4-5.  The prospect of issuing

18  driver's licenses to an estimated 80,000 DACA eligible persons living in Arizona may

19  have raised initial concerns, but as of February 14, 2013, only 14,938 Arizona residents

20  have applied for the DACA program.  Doc. 91-5 at 65.  Any concern about the size of the

21  DACA program in Arizona would no longer appear to be a legitimate rationale for

22  distinguishing DACA recipients from other deferred action grantees.

23      As a second justification, Defendants express concern that issuing driver's licenses

24  to DACA recipients could lead to improper access to federal and state benefits.  But

25  Director Halikowski and Assistant Director Stanton testified that that they had no basis

26  _____

27      [10] Nor can the Court conclude that DACA recipients' (c)(33) category code
    provided a legitimate basis for the State to doubt that they were lawfully present.  The
    Executive Order was issued on August 15, the ADOT policy was formally changed on
28  September 17, and Defendants did not learn about the new (c)(33) category code until
    October 10, 2012.  *See* Doc. 60-1, at 12-15, ¶ 30.

1   for believing that a driver's license alone could be used to establish eligibility for such

2   benefits.  Doc. 99 at 26.  Both testified that they did not know whether a driver's license

3   would entitle a person to receive public benefits.  Doc. 86-4 at 117:11–119:6; Doc. 86-4

4   at 38:10–39:10.  Moreover, because Defendants issue different license types, such as

5   temporary Type F licenses, it would appear that Defendants and others could distinguish

6   a person's eligibility to obtain public benefits on the face of a license.  *See* Doc. 86-4 at

7   41:10-42:11 (stating that MVD issues Type F licenses with shorter than regular

8   expiration dates "for duration of stay based on credentials that are presented" and that the

9   nature of the Type F license is apparent on its face).

10   Defendants' third justification is that the DACA program might be canceled,

11   requiring the State to revoke driver's licenses issued to DACA recipients.  But the

12   depositions of Director Halikowski, Assistant Director Stanton, and MVD Operations

13   Director Charles Saillant show a general lack of knowledge regarding a revocation

14   process.  Doc. 86-4 at 120:8–122:4; Doc. 86-4 at 164:17-22; Doc. 86-4 at 27:5–29:13.

15   Moreover, many aliens eligible to obtain a driver's license under Defendants' current

16   policy may be removed or deported while they have a valid Arizona driver's license, and

17   yet this fact has not caused Defendants to deny them licenses.

18   Defendants' fourth justification is that DACA recipients may have their status

19   revoked at any time and may be removed quickly from the country, leaving those they

20   have injured in accidents with no financial recourse.  But this same concern exists with

21   respect to other deferred action recipients whose status may be revoked at any time, and

22   yet Defendants continue to issue them driver's licenses.

23   In summary, the Court concludes that Defendants' distinction between DACA

24   recipients and other deferred action recipients is likely to fail rational basis review.  The

25   Court is not saying that the Constitution requires the State of Arizona to grant driver's

26   licenses to all noncitizens or to all individuals on deferred action status.  But if the State

27   chooses to confer licenses to some individuals with deferred action status, it may not

28   deny it to others without a rational basis for the distinction.  *See Diaz*, 656 F.3d at 1013

1 ("when a state chooses to provide such benefits, it may not do so in an arbitrary or

2 discriminatory manner that adversely affects particular groups that may be unpopular.").

3 **IV.    Likelihood of Irreparable Harm.**

4       Generally, courts of equity should not act when the moving party "will not suffer

5 irreparable injury if denied equitable relief." *Younger v. Harris*, 401 U.S. 37, 43-44

6 (1971).  Plaintiffs have the burden to establish that, absent a preliminary injunction, there

7 is a likelihood – not just a possibility – that they will suffer irreparable harm.  *See Winter*,

8 555 U.S. at 21-23.   As the Supreme Court has explained, "[t]he key word in this

9 consideration is *irreparable.*  Mere injuries, however substantial, in terms of money, time

10 and energy necessarily expended in the absence of a stay, are not enough.  The possibility

11 that adequate compensatory or other corrective relief will be available at a later date, in

12 the ordinary course of litigation, weighs heavily against a claim of irreparable harm."

13 *Sampson v. Murray,* 415 U.S. 61, 90 (1974) (emphasis in original) (citation omitted).

14 Moreover, when seeking a mandatory injunction, as Plaintiffs do here, an even greater

15 showing of injury is required.  Mandatory injunctions are "not granted unless extreme or

16 very serious damage will result."  *Park Village*, 636 F.3d at 1160.

17       Plaintiffs argue that they will suffer the following irreparable harms in the absence

18 of a preliminary injunction:  (1) deprivation of constitutional rights; (2) denial of driver's

19 licenses, which hinders Plaintiffs' efforts to find and maintain stable employment,

20 develop their resumes, and begin their careers; (3) emotional and psychological harm

21 caused by continued discrimination; and (4) reallocation of ADAC's organizational

22 resources.  The Court will address each category of harm separately.

23       **A.    Constitutional Violation.**

24       Plaintiffs argue that being subjected to unconstitutional state action constitutes

25 irreparable injury, but this is too broad a statement.  To be sure, some constitutional

26 violations virtually always cause irreparable harm.  The Supreme Court has held, for

27 example, that "[t]he loss of First Amendment freedoms, for even minimal periods of

28 time, unquestionably constitutes irreparable injury." *Elrod v. Burns*, 427 U.S. 347, 373

(1976).  But Plaintiffs have not provided legal support for the proposition that all equal protection violations cause irreparable harm.

The Eleventh Circuit has held that an equal protection violation alone is not enough to show irreparable harm.  *See Ne. Fla. Chapter of the Ass'n of Gen. Contractors of Am. v. City of Jacksonville*, 896 F.2d 1283, 1285-86 (11th Cir. 1990) ("No authority from the Supreme Court or the Eleventh Circuit has been cited to us for the proposition that the irreparable injury needed for a preliminary injunction can properly be presumed from a substantially likely equal protection violation.").  Instead, courts must look at the injury caused by the discriminatory act and decide whether that injury is irreparable.  *Id.*  The Ninth Circuit has declined to address this holding.  *See Associated Gen. Contractors of Cal., Inc. v. Coal. For Econ. Equity*, 950 F.2d 1401, 1412 n. 9 (9th Cir.1991).  In *Monterey Mechanical Co. v. Wilson*, 125 F.3d 702, 715 (9th Cir. 1997), however, the Ninth Circuit recognized that money damages might not remedy unconstitutional discrimination, but remanded the case for further evidence rather than holding that an equal protection violation should be presumed to cause irreparable harm.

The Court concludes that it cannot presume a likelihood of irreparable harm merely from the fact that Plaintiffs are likely to succeed on the merits of their equal protection claim.  The nature of the injury they will suffer from being denied equal protection must be examined.  Only if that injury is irreparable will injunctive relief be warranted.  This conclusion is reinforced by recent cases that have emphasized the need for an actual showing of irreparable injury.  In *Flexible Lifeline Systems, Inc. v. Precision Lift, Inc.*, 654 F.3d 989, 995 (9th Cir. 2011), the Ninth Circuit found that two recent Supreme Court decisions, *eBay Inc. v. MercExchange, L.L.C.,* 547 U.S. 388 (2006), and *Winter v. Natural Resources Defense Council, Inc.,* 555 U.S. 7 (2008), precluded a presumption of irreparable harm in copyright cases.  *eBay* had rejected such a presumption in patent cases, and *Winter* had found the Ninth Circuit's granting of a preliminary injunction on the mere "possibility" of irreparable harm to be too lenient.  In *Flexible Lifeline*, the Ninth Circuit stated that "[i]f our past standard, which required a

1   plaintiff to demonstrate at least a possibility of irreparable harm, is 'too lenient,' then

2   surely a standard which presumes irreparable harm without requiring any showing at all

3   is also 'too lenient.'"   654 F.3d at 997.   These cases do not concern constitutional

4   violations, but they do reemphasize the importance of irreparable harm as an essential

5   element of injunctive relief.

6          **B.    Denial of Driver's Licenses.**

7          Plaintiffs argue that denial of driver's licenses hinders their employment prospects

8   and imposes onerous restrictions on their daily lives because driving "is a necessity . . .

9   for the overwhelming majority of Arizona[ns]."   Doc. 30 at 33-34.   The five individual

10  Plaintiffs assert that without licenses they fear they will not be able to maintain or acquire

11  employment (Doc. 30 at 34 (citing Doc. 33, ¶ 6; Doc. 35, ¶ 7; Doc 36, ¶ 7) and cannot

12  drive their children to doctor's appointments and attend to other family responsibilities

13  (Doc. 30 at 35 (citing Doc. 35, ¶ 9; Doc. 36, ¶5)).

14         These same individual Plaintiffs have acknowledged, however, that they either

15  drive or have readily available alternative means of transportation.   One Plaintiff testified

16  that she drove herself to her lawyer's office for her deposition in this case, drives her

17  sister's car to work Monday through Friday of each week, has been driving for about four

18  years, and intends to continue driving to work and school in the future.   Doc. 85-5 at 7-

19  10.   Another Plaintiff testified that she drives her mother's car six days a week, has been

20  driving since age 17, and drives herself to college and work.   Doc. 85-7 at 3-8.   Another

21  Plaintiff testified that he owns a car and drove to work daily for several years.   Doc. 85-3

22  at 3-8.   He stopped driving after he received his DACA permit because he does not want

23  to get in trouble.   *Id.* at 8.   Another Plaintiff owns a vehicle and drives daily.   Doc. 85-6

24  at 7-8.   The final Plaintiff testified that she drives from time to time, she or her husband

25  drives their children to the doctor's office, her father sometimes drives her, and she never

26  has taken the bus and does not know the location of the nearest bus stop to her house.

27  Doc. 85-4 at 4-7.   Given this testimony, the Court cannot conclude that Plaintiffs are

28

1    suffering irreparable harm from being unable to drive as a result of Defendants' policy.[11]

2         Although one Plaintiff has stopped driving because of the DACA program and
3    instead commutes a significant distance to work by light rail and bus, that inconvenience
4    does not constitute irreparable injury.   As noted above, "[m]ere injuries, however
5    substantial, in terms of money, time and energy necessarily expended in the absence of
6    [an injunction], are not enough." *Sampson,* 415 U.S. at 90.  Nor do they constitute the
7    "extreme or very serious damage" required for a mandatory injunction.  *Park Village*,
8    636 F.3d at 1160.

9         **C.   Emotional Harm.**

10        Plaintiffs argue that continued denial of driver's licenses creates the perception
11   that Plaintiffs are inferior and results in emotional and psychological harm.  As evidence
12   of this discriminatory impact, Plaintiffs point to the declaration and deposition testimony
13   of a single individual Plaintiff:  "I feel discriminated when I went to the MVD to get a
14   driver's license, and when they told me that I cannot get a driver's license because of the
15   group of my category, but other group people can get it, so I felt discriminated and it was
16   not fair for me."   Doc. 96-1 at 109:22-110:1.   The Plaintiff provided this further
17   description in a declaration:  "I was crushed when I found out I couldn't get a license.
18   Along with putting my job in jeopardy, it's had a huge impact on me mentally.  Governor
19   Brewer is treating me and people like me differently just because we're Dreamers, even
20   though we have the same rights to live and work here as everyone else.  When I got my
21   work permit, I was excited that I would finally be able to get a license.  My brother and
22   sister both used their work permits to obtain driver's licenses while their green card

23   _____

24        [11] During discovery in this case, Plaintiffs asked the Court to preclude Defendants
     from inquiring into how Plaintiffs were able to drive, obtain jobs, and engage in similar
25   activities without valid Arizona driver's licenses.  The Court agreed to bar such inquiries,
     but in exchange precluded Plaintiffs from arguing that they are irreparably harmed either
26   by being forced to engage in illegal activities or by fear of prosecution for engaging in
     such activities.   Doc. 76.  The Court reasoned that if Defendants cannot inquire into
27   allegedly illegal activities, then Plaintiffs cannot use those activities to prove their case.
     As a result of this limitation, arrived at to protect Plaintiffs from possible incrimination
28   while preserving Defendants' ability to respond to their claims, the Court will not
     consider whether Plaintiffs' fear of prosecution constitutes irreparable harm.

1   applications were pending.  But because I'm a DACA recipient, it wasn't the same for
2   me.  It's terrible to be the target of discrimination."  Doc. 33, ¶ 8.[12]

3         Plaintiffs cite *Chalk v. United States District Court Central District of California*,
4   840 F.2d 701 (9th Cir. 1988), to support their claim that this emotional injury constitutes
5   irreparable harm.   In *Chalk*, the plaintiff was transferred from a classroom teaching
6   position to an administrative position after he was diagnosed with AIDS.  *Id.* at 703.  The
7   district court found that the alternative job placement eliminated any irreparable injury,
8   but the Ninth Circuit disagreed:  "Chalk's original employment was teaching hearing-
9   impaired children in a small-classroom setting, a job for which he developed special
10  skills beyond those normally required to become a teacher.  His closeness to his students
11  and his participation in their lives is a source of tremendous personal satisfaction and joy
12  to him and of benefit to them.   The alternative work to which he is now assigned is
13  preparing grant proposals.  This job is 'distasteful' to Chalk, involves no student contact,
14  and does not utilize his skills, training or experience.  Such non-monetary deprivation is a
15  substantial injury which the court was required to consider."  *Id.* at 709.

16        Surely not every emotional effect constitutes an irreparable injury sufficient to
17  justify the extraordinary remedy of preliminary injunctive relief, and the Court cannot
18  conclude that the evidence of emotional harm presented by Plaintiffs in this case is
19  comparable to the harm described in *Chalk*.  The emotional effect of being denied a
20  driver's license simply is not the same as losing a job for which one has obtained special
21  training and experience, and the accompanying separation from special-needs children to
22  whom the plaintiff had become attached and whom he was uniquely qualified to help.
23  Moreover, the fact that Plaintiffs have presented evidence from only one of the named
24  Plaintiffs on this subject calls into question whether the emotional harms described are

25  ───────────────────

26        [12] Plaintiffs expand this argument in their reply brief to include emotional and
    psychological harm stemming from fear of being stopped and ticketed for not having a
27  driver's license.  Doc. 99 at 36-38.  In addition to the discovery limitation described in
    the previous footnote, the Court will not consider this argument because it was raised for
28  the first time in a reply brief.  *See Bach v. Forever Living Prods. U.S., Inc.*, 473 F. Supp.
    2d 1110, 1122 n. 6 (W.D. Wash. 2007); *Gadda v. State Bar of Cal.*, 511 F.3d 933, 937
    n. 2 (9th Cir. 2007).

1    shared by other members of the Plaintiff class.  Finally, the evidence does not show the

2    "extreme or very serious damage" required for mandatory injunctive relief.  *Park Village*,

3    636 F.3d at 1160.

4         **D.    ADAC's Organizational Resource Reallocation.**

5         Plaintiffs argue that ADAC suffers irreparable harm because it has been forced to

6    reallocate its organizational resources to "deal[] with the logistics of transporting its

7    members, rather than focusing on the organization's core goals of improving community

8    education and civic participation."  Doc. 30 at 35.  Plaintiffs clarify this argument in their

9    reply brief, asserting that "from the moment the state announced its policy, ADAC

10   leadership has spent no fewer than four hours a week, and up to fifteen hours a week,

11   every week, answering members' questions and putting on workshops to help them

12   understand Arizona's policy and its implications."  Doc. 99 at 38.

13        ADAC apparently believes that its response to the Arizona policy is part of its

14   mission and purpose; otherwise, it would not provide the services described.  The Court

15   has difficulty concluding that ADAC is suffering irreparable harm when it is fulfilling its

16   mandate – assisting those who seek to obtain the benefits of the proposed Dream Act and

17   the DACA program.   Moreover, injuries of "money, time and energy necessarily

18   expended in the absence of [an injunction], are not enough."  *Sampson,* 415 U.S. at 90.

19   Nor do they amount to "extreme or very serious damage." *Park Village*, 636 F.3d at

20   1160.[13]

21        In summary, the Court concludes that Plaintiffs have not established that they are

22   likely to suffer irreparable injury in the absence of a preliminary injunction.  Nor have

23

24        [13] Plaintiffs cite *Fair Housing of Marin v. Combs*, 285 F.3d 899, 905 (9th Cir. 2002), *Comite de Jornaleros de Redondo Beach v. City of Redondo Beach*, 657 F.3d 936, 943 (9th Cir. 2011), *El Rescate Legal Services, Inc. v. Executive Office of Immigration Review*, 959 F.2d 742, 748 (9th Cir. 1991), and *Havens v. Realty Corp. v. Coleman*, 455 U.S. 363, 379 (1982), in support of the argument that ADAC will suffer irreparable harm from the frustration of its organization's goals in the absence of a preliminary injunction. Doc. 30 at 35; Doc. 99 at 39.  But these cases dealt with organizational standing, not irreparable harm to an organization.  *Id.*  Plaintiffs also cite *National Fair Housing Alliance v. A.G. Spanos Construction, Inc.*, 542 F. Supp. 2d 1054, 1066 (N.D. Cal. 2008), but that case dealt with the sufficiency of an injunctive relief claim at the motion to dismiss phase.

1   they shown the even higher level of injury required for a mandatory injunction.

2   **V.      Balance of Equities and the Public Interest.**

3          In deciding whether to grant a preliminary injunction, "courts must balance the

4   competing claims of injury and must consider the effect on each party of the granting or

5   withholding of the requested relief. . . . [And] should pay particular regard for the public

6   consequences in employing the extraordinary remedy of injunction." *Winter*, 555 U.S. at

7   24 (quotation marks and citations omitted).

8          The Court concludes that the balance of equities does not strongly favor either

9   side.   Plaintiffs undoubtedly are harmed to some degree by Defendants' apparent

10  violation of their equal protection rights, but, as noted, all of the individual Plaintiffs

11  drive or have driven, all are able to travel to school and work, and Plaintiffs have not

12  shown a likelihood of irreparable harm.  Defendants might be inconvenienced by an order

13  requiring them to issue driver's licenses to Plaintiffs and their class, but Defendants

14  appear to issue licenses to similarly situated individuals without serious difficulties.[14]

15         The Court also concludes that public policy does not strongly favor either side.

16  Public policy surely disfavors violations of equal protection, but it also favors some

17  deference to the political branches of government.

**MOTION TO DISMISS**

18

19  **I.      Legal Standard.**

20         When analyzing a complaint for failure to state a claim to relief under Rule

21  12(b)(6), the well-pled factual allegations are taken as true and construed in the light

22  most favorable to the nonmoving party.  *Cousins v. Lockyer*, 568 F.3d 1063, 1067 (9th

23  Cir. 2009).   Legal conclusions couched as factual allegations are not entitled to the

24  assumption of truth, *Ashcroft v. Iqbal*, 556 U.S. 662, 680 (2009), and therefore are

25  insufficient to defeat a motion to dismiss for failure to state a claim, *In re Cutera Sec.*

26  _____

27         [14] The Ninth Circuit's "serious questions" test also does not support issuing a
28  preliminary injunction.  Although serious questions going to the merits have been raised
    by Plaintiffs' equal protection claim, the balance of hardships does not tip sharply in
    Plaintiffs favor.  *See Stormans, Inc. v. Selecky*, 586 F.3d 1109, 1127 (9th Cir. 2009).

*Litig.*, 610 F.3d 1103, 1108 (9th Cir. 2010).  To avoid a Rule 12(b)(6) dismissal, the complaint must plead enough facts to state a claim to relief that is plausible on its face. *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007).  This plausibility standard "is not akin to a 'probability requirement,' but it asks for more than a sheer possibility that a defendant has acted unlawfully."  *Iqbal*, 556 U.S. at 678 (quoting *Twombly*, 550 U.S. at 556).

**II.    Discussion.**

Defendants move to dismiss Plaintiffs' Supremacy Clause and equal protection claims, and in the alternative move for summary judgment on the equal protection claim. Having found that Plaintiffs have shown a likelihood of success on the merits of their equal protection claim, the Court cannot conclude that Plaintiffs have failed to state such a claim.  Nor will the Court convert the motion to dismiss to one for summary judgment. Only limited discovery has occurred thus far, and Plaintiffs have requested Rule 56(d) relief.  Doc. 91 at 44-51.

As to the Supremacy Clause claim, even under the lenient Rule 12(b)(6) standard, the claim is not based on a cognizable legal theory.  The parties' legal arguments on the motion to dismiss mirror their legal arguments on the motion for preliminary injunction. As the Court concluded above, Plaintiffs' *per se* preemption claim is legally incorrect and their conflict preemption claim – based on a conflict between Arizona's driver's license policy and Congress's enactment of the INA – is not legally viable.

**IT IS ORDERED:**

1.    Plaintiffs' motion for preliminary injunction (Doc. 29) is **denied**.

2.    Defendants' motion to dismiss (Doc. 58) is **granted in part and denied in part**.  Count one is dismissed; Count two survives.

3.    The Court will set a hearing to schedule the remainder of this case.

Dated this 16th day of May, 2013.

David G. Campbell
United States District Judge